Argued and submitted September 28, 1984, affirmed in part and reversed in part on appeal, affirmed on cross-appeal March 20, Gardners' reconsideration and Rierson's reconsideration denied May 10, both petitions for review denied June 25, 1985
(299 Or 314)

GARDNER et al,
*Appellants - Cross-Respondents,*

*v.*

FIRST ESCROW CORPORATION et al,
*Respondents - Cross-Appellants,*

MIDLAND INSURANCE COMPANY et al,
*Respondents.*

(81-9-425; CA A29273)

696 P2d 1172

William J. Howe, III, Portland, argued the cause for appellants - cross-respondents. On the briefs were Robert Harris, and Howe & Harris, Portland.

Terry G. DeSylvia, Portland, argued the cause and filed the briefs for respondents - cross-appellants First Escrow Corporation, an Oregon corporation, and Richard J. Reierson, and respondent Oregon-Oslake, an Oregon corporation.

Michael J. Caro, Portland, argued the cause for respondent Midland Insurance Company, a New York corporation. On the brief were David R. Trachtenberg, and Kobin & Meyer, P. C., Portland.

Dennis H. Henninger, Lake Oswego, argued the cause and filed the brief for respondent Carma J. Daniels.

Before Gillette, Presiding Judge, and Van Hoomissen and Young, Judges.

VAN HOOMISSEN, J.

## VAN HOOMISSEN, J.

Plaintiffs' claim for damages in this case arises out of an exchange of real property. Laeger, an Oregon real estate broker, asked plaintiffs whether they would exchange their Nevada ranch for property in Oregon owned by Praggastis, Laeger's disclosed principal. Plaintiffs agreed to the exchange. Praggastis is not a party to this action.

Under the terms of the exchange agreement, Laeger was to convey title to Praggastis' Clackamas and Mountain Park properties to plaintiffs. The Clackamas property previously had been sold to Pendulum Enterprises on a land sale contract. Plaintiffs were to receive Praggastis' interest in that contract and to assume a vendor's interest in the Clackamas property. Plaintiffs were to assume any encumbrances on the properties, and they were to pay Praggastis $87,000 within five years. In return, plaintiffs were to convey title to their Nevada ranch to Laeger. Praggastis was to assume any encumbrances on the ranch, and he was to pay plaintiffs $150,000 within four months after closing. Originally, the exchange was to be closed in escrow by a Nevada title company. When Laeger objected to that procedure, First Escrow, whose office was in Praggastis' office in Lake Oswego, Oregon, was substituted as escrow agent.

The escrow was closed in July, 1980. Plaintiffs conveyed their ranch to Laeger, who conveyed it to Praggastis. Laeger deeded the Clackamas property to plaintiffs, but it was subject to a previously undisclosed lien. Laeger also deeded the Mountain Park property to plaintiffs. However, because Laeger had not yet received a deed to that property from Praggastis, there was a defect in plaintiffs' title to the Mountain Park property. Unaware of that defect, plaintiffs deeded the Mountain Park property to Laeger and Swallow, the brokers on the exchange, in satisfaction of their commissions. The brokers assumed the encumbrance on the Mountain Park property and agreed to pay plaintiffs any proceeds from its sale in excess of their commissions.

At the time when plaintiffs became aware of the lien on the Clackamas property and the defect in their title to the Mountain Park property, they were having other problems with those properties. In September, 1980, Pendulum Enterprises failed to make its contract payment on the Clackamas

property. In November, 1980, Praggastis failed to pay the $150,000 then due plaintiffs under the terms of the exchange agreement. Plaintiffs subsequently failed to pay the amounts due on the two Oregon properties, and their interests in them were foreclosed.

Later, plaintiffs sued Praggastis in Nevada to rescind the exchange. The rescission action was resolved by a stipulated decree under which plaintiffs regained title to their ranch. They also agreed not to sue Praggastis or Laeger, and all claims were dismissed with prejudice.

Plaintiffs then sued First Escrow Corporation for negligence, breach of contract and fraud, Midland Insurance Company, First Escrow's surety, on its bond, and Reierson and Daniels, First Escrow's shareholders, individually for fraud and shareholder liability. Plaintiffs' claimed damages here are the expense of removing an encumbrance placed on their ranch by Praggastis while he held title to it and the expense of pursuing their rescission action in Nevada.

The trial court granted Reierson's motion for a directed verdict on plaintiffs' fraud claim against him. The court also dismissed plaintiffs' claims against Midland.[1] After a jury returned a verdict for plaintiffs, the trial court granted First Escrow, Reierson and Daniels judgments notwithstanding the verdict on all of plaintiffs' claims except their claims against First Escrow for negligence and breach of contract.

On appeal, plaintiffs contend that the trial court erred (1) in granting Reierson a directed verdict on the issue of fraud, (2) in granting Daniels and First Escrow judgments notwithstanding the verdict on the issue of fraud, (3) in granting Reierson and Daniels judgments notwithstanding the verdict on the issue of shareholder liability and (4) in granting Midland a judgment of dismissal. First Escrow cross-appeals. It contends that the trial court erred in failing to grant its motion for a directed verdict. Alternatively, it contends that the court erred in failing to admit certain evidence. Reierson also cross-appeals. He contends that the court erred

---

[1] Midland was granted partial summary judgment against Reierson and Daniels on its claim for indemnity. Plaintiffs also sued Oregon-Oslake, a corporation owned by Reierson, but later agreed to the entry of an order dismissing the corporation as a party.

in instructing the jury. All three defendants argue that there is no demonstrated casual connection between the loss that plaintiffs suffered and any wrongdoing on defendants' part. On appeal, we affirm in part and reverse in part. On cross-appeal, we affirm.

Plaintiffs first contend that the trial court erred in granting Daniels and First Escrow judgments notwithstanding the verdict on the issue of fraud. They argue that Daniels' failure to disclose material facts when she was under a duty to do so constitutes fraud, that Daniels had "special knowledge" and that she stood in a relationship of trust and confidence to plaintiffs. They also argue that, had they known the facts, they would not have entered into a transaction with First Escrow or allowed First Escrow to close the transaction. Because they did not know the facts, they continued to allow First Escrow to act as their agent and thereby sustained damage. Daniels argues that there was no direct evidence presented to show that she intended to deceive plaintiffs, that she directly participated in the transaction or that any failure to disclose on her part was material.

As to First Escrow, plaintiffs argue that it committed fraud by failing to disclose to plaintiffs that its office was in the reception area of the office of Praggastis, that it was insolvent at all times, that it was obtaining free rent from Praggastis in exchange for escrow and employe services, that its employes were working for Praggastis, that it had no qualified escrow officer at the time this transaction closed, that it assigned all inquiries by the title insurer concerning this transaction to Sasaki, an employe of Praggastis, that it advised Lawyers Title Company that there would be no title insurance on the Mountain Park property when Lawyers Title questioned the absence of a deed to that parcel, that it knew about the lien on the Clackamas property and that title to the Clackamas property would be subject to that lien at closing, and that plaintiffs would not receive any title to the Mountain Park property at closing.

Viewing the evidence in the light most favorable to plaintiffs, *Lipinsky v. Hufft,* 271 Or 572, 573, 533 P2d 328 (1975), we conclude that there was evidence to support the jury's verdict against Daniels and First Escrow for fraud.

The primary allegation of fraud here was that Daniels

failed to disclose material facts. Fraud may be predicated on a failure to disclose material facts when the parties have a fiduciary relationship. *See Starkweather v. Shaffer,* 262 Or 198, 206 n 3, 497 P2d 358 (1972); *Caldwell v. Pop's Homes, Inc.,* 54 Or App 104, 634 P2d 471 (1981). Daniels does not deny that a fiduciary relationship existed between herself and plaintiffs.

The escrow instructions required that plaintiffs approve the state of title to the Oregon properties before the closing. Preliminary title reports were sent to Swallow, the broker, and Johnston, the attorney representing both parties. However, plaintiffs did not receive the reports until after the escrow had closed. As a result, they did not know that there was a lien against the Clackamas property or that Laeger could not convey good title to the Mountain Park property. Daniels argues that the fact that the preliminary title reports were sent to Swallow and Johnston is evidence that she lacked any intent to deceive plaintiffs. Nonetheless, there was evidence from which the jury could infer an intent to deceive, or a knowing or reckless failure to disclose. *See Briscoe v. Pittman,* 268 Or 604, 607, 522 P2d 886 (1974).

Daniels was primarily in charge at First Escrow. She was involved in its daily operations. She had agreed with Praggastis to exchange escrow services for office space. She had First Escrow employes perform clerical services for him. Daniels' daughter, Saboski, one of First Escrow's employes, also worked for Praggastis. First Escrow did not employ any other officer at the time the escrow here was closed. At trial, Daniels was unable to recall who, other than herself, was available to handle closings when the exchange here was closed.

Daniels was aware of the potential conflict of interest between First Escrow and Praggastis. If it was not readily apparent from the ongoing professional relationship that Daniels had with Praggastis, McBride, First Escrow's former employe, brought the potential conflict of interest to her attention. McBride left First Escrow, because she believed Daniels was ordering her to close escrows inappropriately. The evidence indicates that Daniels communicated with Praggastis and his agents but that she never communicated with plaintiffs.

There was evidence from which the jury could have

found that, in her individual capacity, Daniels performed escrow services on the exchange here. Although she testified that she was not "directly" involved, the jury was not required to believe her. To the extent that the acts of misconduct complained of were not due to Daniels' individual conduct, there was evidence from which the jury could have found that First Escrow's misconduct was attributable to her. We conclude that the trial court erred in granting defendants Daniels and First Escrow judgments notwithstanding the verdict on plaintiffs' fraud claims.

Plaintiffs next contend that the trial court erred in granting Reierson and Daniels judgments notwithstanding the verdict on the issue of shareholder liability. Plaintiffs' theory was that First Escrow was controlled by its stockholders, Daniels and Reierson, and that the corporation was inadequately capitalized. They argue that the trial court's finding that First Escrow was undercapitalized is inconsistent with its ruling, that Daniels and Reierson improperly controlled First Escrow and that that was the reason plaintiffs were not able to satisfy their judgment against First Escrow.

ORS 57.131(1) provides:

> "A holder of or subscriber to shares of a corporation shall be under no obligation to the corporation or its creditors with respect to such shares other than the obligation to pay to the corporation the full consideration for which such shares were issued or to be issued."

However, under certain circumstances, a creditor of a corporation may "pierce the corporate veil" and recover directly from a shareholder. *See* Barber, "Piercing the Corporate Veil," 17 Willamette L Rev 371, 373-75 (1981). In *Amfac Foods v. Int'l Systems,* 294 Or 94, 101, 108, 654 P2d 1092 (1982), the Supreme Court explained:

> "The corporate form was not intended to be a device by which persons could engage in business without obligation or risk. The privilege of limited liability of the shareholders of a business corporation carries with it the obligation to conduct business as a corporation, and abuse of the privilege may create personal liability for the act of the corporation. F. Powell, Parent and Subsidiary Corporation 2 (1931).
>
> "* * * * *
>
> "We state the exception to the rule as follows: When a

plaintiff seeks to collect a corporate debt from a shareholder by virtue of the shareholder's control over the debtor corporation rather than on some other theory, the plaintiff must allege and prove not only that the debtor corporation was under the actual control of the shareholder but also that the plaintiff's inability to collect from the corporation resulted from some form of improper conduct on the part of the shareholder. This causation requirement has two implications. The shareholder's alleged control over the corporation must not be only potential but must actually have been exercised in a manner either causing the plaintiff to enter the transaction with the corporation or causing the corporation's default on the transaction or a resulting obligation. Likewise, the shareholder's conduct must have been improper either in relation to the plaintiff's entering the transaction or in preventing or interfering with the corporation's performance or ability to perform its obligations toward the plaintiff."[2]

■　　There is evidence from which the jury could have found that First Escrow was under the actual control of Daniels and Reierson. Each owned 50 percent of its stock; each contributed $500 as initial capital. Reierson guaranteed a $10,000 loan to First Escrow, then borrowed $5,600 from the corporation. Daniels was active in managing First Escrow.

---

[2] The trial court stated:

"THE COURT: Now, let's take that next step, piercing the corporate veil. I reviewed the cases, and they're almost decided on a case by case basis. There's hardly a general rule that you can glean from these cases that would be applicable here.

"I don't see any immoral act that either she or Mr. Reierson committed. She was within the law all the time.

"They formed the corporation within the law. They received the escrow license from the real estate commissioner. This transaction really, when you look at it, really wasn't a very complicated transaction. The title company accomplished the lien. She relied on the title company. The thing that they didn't do was to send your clients a copy of the preliminary report.

"Now, following those facts, now, sure, they didn't have any money, the corporation didn't. It was undercapitalized but it's within the law. And in reading those cases, that piercing the corporate veil, those are almost decided on a case by case basis.

"A lot of them involved holding companies, and in the Amfac case, they recognized that undercapitalization is not sufficient, sole ownership is not sufficient. None of those things in and of themselves is sufficient.

"So, I can't see where this is a case where the corporate veil should be pierced."

She negotiated the services for space agreement with Praggastis. She hired, fired and supervised First Escrow's employes. As previously noted, there was evidence to support the jury's verdict against Daniels for fraud in connection with the exchange.

Further, there was evidence from which the jury could have found that First Escrow was inadequately capitalized; the judge acknowledged that fact. Inadequate capitalization of a corporation is a form of improper conduct. *Amfac Foods v. Int'l Systems, supra,* 294 Or at 109. Although there is no statutory minimum capitalization requirement in Oregon, a corporation must have sufficient capital to cover its reasonably anticipated liabilities, measured by the nature and magnitude of its undertaking, the risks attendant to the particular enterprise and normal operating costs associated with its business. *See Anderson v. Abbott,* 321 US 349, 362, 88 L Ed 793, 64 S Ct 531 (1944); *Gallagher v. Reconco Builders, Inc.,* 91 Ill App 3d 999, 415 NE2d 560, 564 (1980); *Ballantine on Corporations* 302 (rev ed 1946). Sufficiency of capital is measured at the time a corporation is formed and begins operations. *See J-R Grain Co. v. FAC, Inc.,* 627 F2d 129, 135 (8th Cir 1980); Henn, *Law of Corporations* § 146 (2d ed 1970); *compare DeWitt Truck Brokers v. W. Ray Flemming Fruit Co.,* 540 F2d 681, 685 (4th Cir 1976) (ongoing duty to have adequate capital). First Escrow was undercapitalized when it was formed and began operations. It always had difficulty meeting its daily operating expenses and paying its employes. It moved to Praggastis' office because it had no money to pay rent. Reierson testified that no thought was given concerning whether its initial capitalization was sufficient. Defendants argue that, as a result of the loan, capital was increased by $10,000. However, $5,600 was borrowed by Reierson. In addition, as a loan, the money did not increase the worth of the corporation. Daniels' contribution was returned to her. First Escrow never made a profit. Its 1980 financial statement showed assets of $30 and a net loss of $10,300. Its 1981 financial statement showed no assets and shareholder equity of negative $7,500. It ceased doing business in January, 1981. The exchange here involved several million dollars worth of real property. First Escrow's potential liability was substantial. First Escrow argues that its $25,000 statutory escrow bond is part of its capital. We disagree. That bond is not a

fund of unencumbered capital available to the corporation. We conclude that a jury could have found that First Escrow was inadequately capitalized.

There was evidence from which the jury could have found that Daniels' and Reierson's control was exercised in a manner "either causing plaintiff to enter the transaction with the corporation or causing the corporation's default on the transaction or the resulting obligation." *See Amfac Foods v. Int'l Systems, supra,* 294 Or at 108. Daniels negotiated the escrow services for office space agreement with Praggastis. Laeger, Praggastis' agent, was responsible for having the escrow transferred from Nevada to First Escrow. First Escrow and its shareholders had a financial interest in acting as escrow agent, because providing such services for Praggastis was in lieu of rent. A jury could have found that plaintiffs would not have agreed to have First Escrow close the exchange had they been aware of the relationship between First Escrow and Praggastis.

Plaintiffs recovered a judgment against First Escrow. Because it has no assets, it has been unable to satisfy that judgment. A jury could have found that First Escrow's lack of assets was directly attributable to the failure of Daniels and Reierson to provide adequate capital for the corporation. Viewing the evidence in the light most favorable to plaintiffs, we conclude that the trial court erred in allowing Daniels and Reierson judgments notwithstanding the verdict on the issue of shareholder liability.

Finally, plaintiffs contend that the trial court erred in granting Midland Insurance, First Escrow's surety, a judgment of dismissal. They argue that an escrow surety bond protects parties injured by the misconduct of the escrow agent, that they were so injured and that they are the true obligees on the bond. Alternatively, they argue that, as third-party beneficiaries of the bond, they may bring a direct action against the bond. They contend that, because the Oregon Escrow Law, ORS 696.505 *et seq,* contains no explicit provision allowing the state to bring an action against the surety, there is no means of access to the bond proceeds in the absence of a direct action by the injured party.

Midland argues that the state is the named obligee on the bond; that the bond is only regulatory in nature; that a

private right of action on a bond must be expressly provided either in the bond or by statute; and that other comparable regulatory bonds do not permit direct action against the bond.

ORS 696.508(1) provides:

"The Legislative Assembly finds the activity of escrow agents in handling large sums of money and important rights of clients to be of public concern. In order to permit uniform and equitable regulation of all escrow agents and to improve the standards of escrow conduct, the provisions of ORS 696.505 to 696.585 shall be construed to grant the commissioner authority to protect the public."

The bond here is an indemnity bond. It conforms to the requirement of ORS 696.525(1).[3] It binds the surety to the

---

[3] ORS 695.525(1) provides in relevant part:

"(1) At the time of filing an application for an escrow agent's license, the applicant shall deposit with the commissioner a corporate surety bond running to the State of Oregon, executed by a surety company satisfactory to the commissioner, in the sum of $25,000, the provisions to be in the form substantially as follows:

"Know All Persons by These Presents, That we, _____, as principal, and _____, a corporation, qualified and authorized to do business in the State of Oregon as surety, are held and firmly bound unto the State of Oregon for the use and benefit of any interested person, in the sum of $25,000, lawful money of the United States of America, to be paid to the State of Oregon for the use and benefit aforesaid, for which payment well and truly to be made, we bind ourselves, our heirs, executors, administrators, successors, and assigns, jointly and severally, firmly by these presents.

"The condition of the above obligation is such that: Whereas the above-named principal has made application for registration as an escrow agent within the meaning of ORS 696.505 to 696.585 and is required by the provisions of ORS 696.505 to 696.585 to furnish a bond in the sum above named, conditioned as herein set forth:

"Now, therefore, if the principal, the principal's agents and employes, shall strictly, honestly and faithfully comply with the provisions of ORS 696.505 to 696.585, and shall pay all actual damages suffered by any person by reason of the violation of any of the provisions of ORS 696.505 to 696.585, now or hereafter enacted, or by reason of any fraud, dishonesty, misrepresentation or concealment of material facts growing out of any transaction governed by the provisions of ORS 696.505 to 696.585, then this obligation shall be void; otherwise to remain in full force and effect.

"This bond shall become effective on the _____ day of _____, 19___, and shall remain in force until the surety is released from liability by the commissioner, or until this bond is canceled by the surety. The surety may cancel this bond and be relieved of further liability hereunder by giving 30 days' written notice to the principal and to the commissioner.

"This bond shall be one continuing obligation, and the liability of the surety

state. ORS 696.525(1) requires that the bond's proceeds be paid to the state. The proceeds, however, are "for the use and benefit of any interested person." The statute contains no language that explicitly answers how an "interested person" may collect on the bond.

█ ██ Statutes enacted for the benefit of the public should be liberally construed to effectuate the purpose for which they were enacted. *See Fitzgerald v. Neal,* 113 Or 103, 110, 231 P 645 (1924). When we interpret the terms and substance of a statute, we are directed "not to insert what has been omitted, or to omit what has been inserted." *See* ORS 174.010; *So. Sea. Auto Auction v. W. Cas.,* 41 Or App 707, 711, 598 P2d 1269 *rev den* 288 Or 173 (1979).

█ We conclude from the statutory language of ORS 696.525(1), and from the Oregon Escrow Law as a whole, that the legislature intended that the Real Estate Commissioner administer escrow bond proceeds in favor of "interested persons" injured due to the misconduct of escrow agents and that direct action against the surety by an injured party is not authorized.

ORS 696.508(1) provides that the Oregon Escrow Law "shall be construed to grant the commissioner authority to protect the public." The commissioner may prescribe procedures, through rule making authority, by which any "interested person," ORS 696.525(1), may attempt to collect on a bond. The commissioner has a duty to protect all interested persons. That duty, and the purpose of escrow bonds generally, would be frustrated if the commissioner lacked authority to administer bond proceeds. Here, it appears that plaintiffs are the only claimants against First Escrow's bond. That may not be true in every case. An orderly procedure for recovery is preferable to a haphazard one dependent on which party first discovers an injury, retains a lawyer and recovers judgment.

█ A statutory bond is *sui generis;* it must be interpreted by its own terms. When the legislature has intended to allow direct action against a statutory bond, it expressly has so

---

for the aggregate of any and all claims which may arise hereunder shall in no event exceed the amount of the penalty hereof."

provided.[4] *See Jacobs Associates v. Argonaut Ins. Co.,* 282 Or 551, 580 P2d 529 (1978). ORS 696.525(1) provides only that an escrow bond is for the benefit of interested persons. The state has authority to disburse bond proceeds.[5] We conclude that Midland's motion to dismiss was properly granted.[6]

On cross-appeal, First Escrow contends that the trial court erred in failing to grant its motion for a directed verdict. Alternatively, it argues that it is entitled to a new trial because of the trial court's refusal to admit evidence of the litigation in Nevada that resulted in a settlement between plaintiffs and Praggastis and of the foreclosure of the Oregon properties. It also contends that the trial court erred in refusing to give its requested instruction on causation and in refusing to allow additional time for it to produce Praggastis as a witness.

First Escrow did not preserve the claim of error that it argues entitled it to a directed verdict. A motion for a directed verdict must state the specific grounds on which the party relies. ORCP 60. At trial, First Escrow argued that plaintiffs had failed to prove "any damage." The record shows that First Escrow was arguing that there was no damage because of certain setoffs and credits arising out of the Nevada litigation. In its motion for judgment notwithstanding the verdict, First Escrow did raise the cause-in-fact issue. However, that is not enough to preserve the claimed error for appellate review. A motion for a directed verdict must be made before the moving party may move for a judgment notwithstanding the verdict. ORCP 63A.; *Stark v. Henneman,* 250 Or 34, 36, 440 P2d 364 (1968). The grounds asserted in the

---

[4] *See, e.g.,* ORS 481.310(3) (automobile dealer); ORS 279.536 (public construction contracts); ORS 537.753(2) (water well contractors).

[5] ORS 696.527, which concerns a cash deposit in lieu of a bond, provides, in relevant part:

"(3) The commissioner, by order, shall have discretion to authorize the State Treasurer to use such deposit, as follows:

"(a) To satisfy any final judgment entered against the escrow agent for actual damages suffered by any person by reason of the violation of any of the provisions of ORS 696.505 to 696.585, now or hereafter enacted, or by reason of any fraud, dishonesty, misrepresentation or concealment of material fact growing out of any escrow transaction * * *."

[6] In view of our disposition of their other assignments, plaintiffs waive their fourth assignment that the trial court erred in granting defendant Reierson a directed verdict on the issue of fraud.

motion for judgment notwithstanding the verdict must previously have been raised in a motion for a directed verdict and in a manner that specifically brings the issue to the trial court's attention. *See Johnson v. Smith,* 24 Or App 621, 624, 546 P2d 1087, *rev den* (1976). First Escrow did not do that. Therefore, any error was waived.

We also conclude that First Escrow's other arguments lack merit.

On Reierson's cross-appeal, we find no error.

Affirmed in part and reversed in part on appeal; affirmed on cross-appeals.