Argued and submitted October 4, 1996, affirmed February 12, respondent's petition for reconsideration filed February 18 and appellant's petition for reconsideration filed February 24 allowed by opinion April 30, 1997
See 147 Or App 586, 938 P2d 778 (1997)

NORTHWEST NATURAL GAS COMPANY,
an Oregon corporation,
*Appellant,*

*v.*

CHASE GARDENS, INC.,
*Respondent,*

*and*

KEY BANK OF OREGON,
an Oregon state banking corporation;
Willamette Production Credit Association,
an Oregon business;
Centennial Bank,
an Oregon state banking corporation;
Orix Credit Alliance, Inc.,
an Oregon corporation;
Turco Engineering, Inc.,
an Oregon Corporation;
Benno Dobbe, dba Holland America Bulb Farms,
a Washington corporation;
Westar Marketing Company,
abn Oregon Natural Gas Development Corporation,
an Oregon corporation;
and State Accident Insurance Fund,
an Oregon corporation,
*Defendants.*

(16-91-01370; CA A90481)

933 P2d 370

John Faust, Jr., argued the cause for appellant. With him on the briefs was Schwabe, Williamson & Wyatt.

Joel De Vore argued the cause for respondent. With him on the brief were Robert H. Fraser, Joe B. Richards, David A. Jacobs and Luvaas, Cobb, Richards & Fraser, P.C.

Before Warren, Presiding Judge, and Edmonds and Armstrong, Judges.

WARREN, P. J.

## WARREN, P. J.

Plaintiff Northwest Natural Gas Company (NWNG) filed this action against defendant Chase Gardens, Inc. (Chase) and others, seeking to collect money that Chase owed for natural gas and natural gas transportation services[1] and to foreclose agricultural service liens that NWNG had placed on Chase's crop in order to secure those amounts. Chase counterclaimed to recover from NWNG for breach of contract and for intentional interference with Chase's relationship with the Centennial Bank (the bank), Chase's lender.

The issues at trial were NWNG's collection claim and Chase's counterclaims. The jury found that Chase owed NWNG $182,069.09 for gas and gas transportation and that NWNG was liable to Chase for $1,900,000 for breach of contract and for $2,151,226 compensatory damages and $3,000,000 punitive damages for intentional interference with Chase's relationship with the bank. The court entered judgment for NWNG on its contract claim and for Chase on its intentional interference claim. It did not enter a money judgment on Chase's breach of contract counterclaim because the damages duplicated those on the tort claim. NWNG appeals and we affirm.

We state the facts most favorably to Chase, because the verdict in its favor is the sole issue on appeal. *See Tadsen v. Praegitzer Industries, Inc.*, 324 Or 465, 468, 928 P2d 980 (1996); *Roach v. Mead*, 301 Or 383, 385, 722 P2d 1229 (1986); *Krause v. Eugene Dodge, Inc.*, 265 Or 486, 490, 509 P2d 1199 (1973). Chase owned 50 acres of land in Eugene, including 20 acres of heated greenhouses in which it grew flowers. Although Chase had grown many kinds of flowers during its 100 year history, by the 1980's it concentrated primarily on roses. Its flowers were traditionally considered to be of high quality, and it had developed markets for them throughout this country and abroad. In the mid-1980's Chase's primary source of heat for the greenhouses was steam that it purchased from the Eugene Water and Electricity Board

---

[1] As well as selling natural gas directly to its customers, NWNG also uses its pipelines to transport to them gas that they have purchased elsewhere.

(EWEB). It also had back-up boilers in which it could burn various fuels to produce steam at the site.

During the mid and late 1980's, Chase experienced financial difficulties, in part as the result of new competition from Latin American growers, and had significant losses in several of those years. That situation led it to develop plans to reduce expenses and to restructure and reduce its operations. For some years, Chase had paid NWNG a small monthly fee for a standby gas service that it occasionally used for fuel when it needed to produce steam from its own boilers. As part of reducing its expenses, in early 1988 Chase told NWNG to remove the service and disconnect the meter.

Instead of complying with Chase's request, NWNG responded by attempting to convince Chase to make natural gas its primary fuel for producing steam to heat the greenhouses. Based on an engineering study that NWNG commissioned and on its conversations with NWNG officials, Chase decided to heat primarily with gas. In late September 1988, Chase signed a contract to receive natural gas service from NWNG.[2] It also replaced or modified its boilers so that they would be more compatible with gas. Chase chose interruptible gas service, because the costs were lower than with firm service. Interruptible service allowed NWNG to order Chase to stop using gas in times of high demand and required Chase to have an alternative fuel available. Chase would be subject to high penalty rates if it continued to take gas after receiving notice of an interruption.

Although Chase cut and sold flowers every day, its business was essentially cyclical, with the bulk of sales and income coming from Valentine's Day, Easter, and Mother's Day. Because its major investments in material and plants, and many of its major expenses, came at times when sales were relatively low, during most of the year Chase lost substantial amounts. It balanced those losses by large profits during the late winter and spring holidays. This cyclical cash flow led to cyclical problems in paying its bills. As an example, it had once fallen $250,000 behind in its payments to

---

[2] For most of the period, Chase actually purchased the gas from an affiliate of NWNG, which delivered it to NWNG for transportation to Chase. During that time, NWNG charged only for transportation services.

EWEB but eventually paid the entire amount. Some of its highest energy use came during months when its cash flow was low.

Chase's officers explained the company's operations, including its cash flow problems, to NWNG officials before agreeing to the contract with NWNG. In response, NWNG's senior vice president stated that Chase would be an important customer and that "we will work with you." To Chase, that statement meant that NWNG understood its situation and would adapt to it.

By January 1989, Chase had fallen behind in its payments to NWNG. It did not completely resolve the shortfall from its spring income. Beginning in August 1989, Chase and NWNG agreed on several plans for bringing its account current, but Chase was never able to eliminate the entire debt. At the end of November 1990 Chase made, and NWNG accepted, a late payment that was sufficient to cover the current billing but that failed to include the agreed payment on the arrearages. After that payment, Chase's total debt for NWNG's gas transportation services was a little less than $8,000.

Because Chase failed to order enough gas from its supplier to cover the gas that it took from NWNG, in fall 1990 NWNG determined that it had in effect become the supplier as well as the transporter of Chase's gas. NWNG's bill for Chase's November usage was $44,605.17, which brought the total amount owed to $52,563.04. NWNG sent the bill in early December, with a payment due date of December 26. In mid-December, Chase attempted to get NWNG to agree to modify the repayment schedule and to allow Chase to defer part of the December and January bills in anticipation of the Valentine's Day harvest. NWNG's credit manager, who had not been involved in the discussions before Chase signed the contract, refused. Chase made no more payments to NWNG.

During December 1990, the Eugene area experienced the longest, broadest spectrum cold spell in its history. The increased demand for gas led NWNG to notify Chase to discontinue taking gas so that it could meet the demands of its firm customers. Chase, however, was unable to get its fuel oil system to work properly for several days. It therefore used

a large amount of gas at high penalty rates. As a result of the cold and of the penalty rates, Chase's bill for December, which NWNG prepared in early January, was for an additional $96,331.92.[3]

Chase's failure to make the agreed arrearage payment in November was a result of renewed cash flow problems. In an effort to overcome those problems, it decided not to emphasize Christmas sales in 1990 but to focus on its primary sales periods of Valentine's Day, Easter, and Mother's Day in 1991. That year was unusual because the three holidays happened to coincide with the plants' natural cycle, allowing Chase to produce the maximum number of flowers without the effort of forcing the plants. For cash flow until Valentine's Day it could rely on its regular bank line of credit against its receivables and on a special "bulge" line of $100,000 that was available on February 1 for harvesting the Valentine's Day crop. Chase anticipated that sales from that crop both would finance the remaining holidays' crops and, together with those crops, would provide money to pay its creditors, including NWNG. Its problem was getting to Valentine's Day.

On December 27, NWNG's credit manager wrote Chase that its bill was "past due in the amount of $49,832.17," a figure that included the billing for November, which was due on December 26, and the November and December payments on the arrearages. He threatened to terminate gas service unless Chase paid that amount by January 4, 1991. Before he wrote this letter, NWNG had also decided to file a lien for the past due amount; it did so on December 31. Because the lien amount included two unpaid payments for arrearages that arose from services that NWNG had provided more than six months before it filed the lien and thus were no longer lienable, it was erroneous. ORS 87.256.[4] The actual lienable amount was $44,605.17. NWNG

---

[3] Chase's usage in January resulted in a bill for an additional $33,174.13. The total amount owed was $182,069.09, which is the amount of the verdict and judgment on NWNG's claim.

[4] ORS 87.256 provides:

"Persons claiming liens created by ORS 87.216 to 87.232 are only entitled to liens for labor, services or materials performed or furnished during the six months immediately preceding the filing of the notice of claim under ORS 87.242."

sent the December 27 letter to the wrong address, with the result that Chase did not receive it until January 4.

Before NWNG filed the lien, its credit manager had learned that the bank was Chase's lender. The credit manager was a former banker who knew that banks like to be "at the very top of the pecking order" and that they become worried when someone files a lien that might have priority over their security. He filed the lien in part so that NWNG would get the bank's attention; he had received payment in two previous instances after filing liens. He knew that banks with lines of credit secured by accounts receivable often make the decisions about which creditor gets paid and that the lien would require the bank to deal with NWNG. He also knew that it was reasonably foreseeable that the lien would lead the bank to stop Chase's line of credit and would thus dry up its cash flow; he was willing to take that risk. The NWNG official who signed the lien knew that it would probably hinder Chase's cash flow and admitted that closing the business was the logical consequence of filing the lien.

Chase called the credit manager on January 4, when it received the December 27 letter. In that call it learned about the lien. Several days later, Chase met with the credit manager and an NWNG attorney. Chase proposed to give NWNG priority over most other unsecured creditors and to give it a second mortgage on a house that would secure most of the amount claimed in the lien. It warned NWNG that, if the rose plants were not heated, Chase would be forced to close and unsecured creditors would receive nothing. The credit manager knew that Chase depended exclusively on the bank's line of credit for its operating cash flow. He agreed to a short hiatus to discuss the situation with NWNG management. The NWNG attorney commented that Chase should check with the bank, because the lien "may give [its officials] a cramp in their stomach."

After the meeting, and without carefully analyzing the financial information that Chase had provided, the credit manager recommended to his superiors that NWNG terminate service to Chase on January 11 and that it file additional liens for the gas that Chase used in December and January.[5] He recognized that these actions would close Chase's

---

[5] NWNG filed additional liens on January 14 and February 15, 1991. Neither party argues that those liens are relevant to the issues at trial or on appeal.

doors and impair the collection of NWNG's debt. He preferred that result to allowing Chase to continue, because "[i]f they do get through this year, we'll be dealing with them again next year * * *."

NWNG management did not agree to immediate termination of gas service. Instead, on January 9 the credit manager sent Chase a letter that gave it two options:

"1) Pay Northwest Natural Gas company $100,000. If you choose this option, the Agricultural Services Lien filed on December 31, 1990, for $49,832.17, would be terminated.

"2) Pay Northwest Natural Gas Company $60,000. If you choose this option, the Agricultural Services Lien filed on December 31, 1990, for $49,832.17, would remain in force."

According to the letter, if Chase did not comply with either option by January 15, NWNG would terminate gas service on January 16. If Chase did comply, NWNG would require it to pay all future bills within normal terms and to make and maintain payment arrangements on the arrears.

The bank received formal notice of the lien on January 9, 1991. The next day it cut off Chase's line of credit, solely because of the lien; as of December 1990 it still believed that Chase would be successful. Without money from the bank, Chase was unable to meet either of the conditions in NWNG's letter. It stopped taking gas on January 10; on January 11 it shut down its oil burners rather than take delivery of oil for which it could not pay. It immediately laid off most of its employees and used what money it had available to pay their wages. Chase closed its business because the lien resulted in the bank's withdrawing its line of credit, not because NWNG threatened to terminate gas service.

On January 14, Chase warned NWNG that the effect of the lien could cause it damages in excess of $2,000,000. The next day, the credit manager called the bank to determine the bank's willingness to provide money to Chase. He did not offer to subordinate NWNG's lien to the bank's security interest. The bank officer testified that the

credit manager sounded a little smug during the conversation. At a final meeting on January 16, in Chase's cold greenhouses, the credit manager stated that senior management had specifically instructed him not to make any presentation that would involve removing the lien.

On appeal, NWNG assigns error to the trial court's denial of its motions for directed verdict on the breach of contract and wrongful interference counterclaims, asserting that there is insufficient evidence to support them. In considering those assignments, we view the evidence, including all reasonable inferences that the jury could draw from it, in the light most favorable to Chase. We cannot set the verdict aside unless there is *no* evidence from which a reasonable jury could find facts that establish the elements of the counterclaims. Or Const, Art VII (Amended), § 3; *Brown v. J. C. Penney Co.*, 297 Or 695, 705, 688 P2d 811 (1984); *Lanz v. Douglas Tool & Engineering, Inc.*, 138 Or App 89, 92, 907 P2d 1128 (1995).

■ The decisive issue is whether the evidence permitted the jury to find that NWNG committed the tort of intentional interference with Chase's relationship with the bank. Because we hold that it did, we do not need to consider the issues related to the breach of contract counterclaim. The elements of the tort are:

> "(1) the existence of a valid business relationship or expectancy, (2) intentional interference with that relationship, (3) by a third party, (4) accomplished through improper means or for an improper purpose, (5) a causal effect between the interference and damage to economic relations, and (6) damages." *Uptown Heights Associates v. Seafirst Corp.*, 320 Or 638, 651, 891 P2d 639 (1995).

NWNG challenges only the fourth element, the use of improper means or the existence of an improper motive for its actions. Those issues center on NWNG's filing of the lien and its refusal to remove it on terms that Chase could satisfy.

■■ We first consider the issue of improper motive in filing the lien. NWNG insists that the exercise of its statutory right to a lien cannot, as a matter of law, constitute an improper motive. It argues that it was within the reasonable

expectation of the parties for NWNG to use whatever remedies were legally available to collect what Chase admittedly owed. It relies on *Uptown Heights*, in which the Supreme Court held that, when a party invokes an express contractual remedy, it cannot be liable for intentional interference based solely on its motive for invoking the remedy.[6] Invocation of an express contractual remedy is, as a matter of law, a legitimate purpose for the interference. 320 Or at 651-52. We agree with NWNG that the Supreme Court's reasoning extends to the circumstances under which NWNG used the express statutory remedy of a lien.

■     Chase alleged that NWNG's motive was improper because its

> "objective was to obtain a more favorable position in relation to Chase Gardens' other creditors and Centennial Bank, than allowed by law or agreement between the parties, and it had no intention of allowing Chase Gardens to harvest its crop."

To the extent that Chase's counterclaim is based on NWNG's attempt to improve its position by filing the lien, it fails. There is nothing inherently improper about one creditor seeking to push itself ahead of other creditors. In order to establish an improper purpose, thus, Chase must prove its additional allegation that NWNG sought to gain a more favorable position *than the law or the agreement of the parties permitted*. Because the contract, by operation of law, permitted NWNG to file the lien, its purpose in doing so cannot be improper and that claim also fails.

■     In *Uptown Heights*, the Supreme Court held that a party's use of one of the remedies that the contract expressly provides cannot be evidence of an improper purpose. Chase argues that that rule does not apply in this case because NWNG invoked an express *statutory* rather than express *contractual* remedy when it filed the lien. In these circumstances, that is a distinction without a difference. NWNG had an express statutory right to a lien when it entered into the contract with Chase. That remedy, therefore, was necessarily

---

[6] The Supreme Court declined to decide whether such an action could be evidence of improper means. *Uptown Heights*, 320 Or at 652 n 5.

within the contemplation of the parties. It became part of their contract by operation of law. *See Ocean A. & G. Corp., Ltd., v. Albina M.I. Wks.*, 122 Or 615, 617, 260 P2d 229 (1927) (the applicable law of the land becomes part of every contract); *see also Von Hoffman v. City of Quincy*, 71 US 535, 550, 18 L Ed 403 (1866) ("the laws which subsist at the time and place of the making of a contract, and where it is to be performed, enter into and form a part of it, as if they were expressly referred to or incorporated in its terms"); *United States Trust Co. v. New Jersey*, 431 US 1, 19-20 n 17, 97 S Ct 1505, 52 L Ed 2d 92 (1977) (basis of *Von Hoffman* rule is presumption that "contracting parties adopt the terms of their bargain in reliance on the law in effect at the time the agreement is reached").

Chase argues that the contract with NWNG expressly gave NWNG several remedies on default: to impose late fees, to require a deposit, and to terminate service. The contract thereby, Chase says, limited NWNG to those express remedies. That statement is incorrect. The contract does not expressly declare that the listed remedies are exclusive, and nothing in it expressly limits NWNG's statutory right to assert a lien. Even if we were to look outside the writings, NWNG's knowledge of Chase's situation and its statement that "we will work with you" do not constitute a waiver of a statutory right that is otherwise part of the contract.[7] The right to file a lien, therefore, is part of the contract.[8] Under the Supreme Court's analysis in *Uptown Heights*, NWNG cannot have acted with an improper purpose by properly invoking a remedy that is part of the contract.[9]

---

[7] Relying on *Lee v. Wood Products Credit Union*, 275 Or 445, 551 P2d 446 (1976) and *Fisher v. Tiffen*, 275 Or 437, 551 P2d 1061 (1976), Chase argues that NWNG waived the right to timely payment when it accepted a late payment in November. In those cases each creditor had established a pattern of accepting late payments that lulled the debtor into believing that the creditor would not insist on timely payment. In this case NWNG accepted one late payment and, in the next bill that it sent to Chase, stated a specific due date that was consistent with its previous practice. There was no waiver.

[8] Chase cross-assigns error to the trial court's holding that the lien was valid despite its inclusion of both lienable and nonlienable items. *See Hays v. Pigg*, 267 Or 143, 148, 515 P2d 924 (1973). Because Chase had sufficient knowledge to question the amount of the lien, it was valid as to the correct amount. *See Alley v. Erbach*, 89 Or App 5, 9, 747 P2d 360 (1987); *Robertson, Hay & Wallace v. Kunkle*, 69 Or App 99, 103-04, 686 P2d 399 (1984).

[9] We discuss Chase's arguments concerning the use that NWNG actually made of the lien below.

■      We next consider whether NWNG used improper means and whether it had an improper purpose for actions other than filing and enforcing the lien. The jury could find that, although the lien was valid, NWNG attempted to use it improperly to gain advantages to which it was not entitled and that it intended to cause Chase to go out of business if its improper conditions were not met. The crucial event in this regard was the January 9 letter, in which, the jury could find, NWNG gave Chase the choice of paying $100,000 in order to have the lien removed or paying $60,000 and leaving the lien in place.

NWNG argues that the purpose of the January 9 letter was solely to state the conditions under which it was willing to continue to provide gas to Chase. It points out that, had Chase merely wanted to require NWNG to remove the lien, it could have done so by paying the amount claimed. ORS 87.346(1). NWNG fails to recognize that the jury could find that the letter involved more than whether NWNG would continue service; it could find that the letter also involved the terms on which NWNG would release the lien. NWNG sent the letter in response to discussions with Chase that included Chase's efforts to get NWNG to remove the lien and NWNG's comments on the effect of the lien on the bank. The jury could find that it is reasonable to read the letter as describing *both* the conditions for continuing service *and* the conditions for removing the lien. If the jury found that that was the nature of the letter, NWNG's own argument shows that the letter was improper, because it was an attempt to use the lien in a way that NWNG had no legal right to use it. The jury could find that the letter indicated that NWNG would not remove the lien even if Chase paid the amount of the lien. The letter was thus an improper means.

NWNG sent the letter after Chase described its financial situation in some detail and after an NWNG attorney pointed out to Chase the effect that the lien might have on its relationship with the bank. NWNG knew that Chase's only source of money to pay NWNG's demands was the bank and that the bank was unlikely to provide that money if NWNG insisted on a lien that would leave the bank's security interest subordinate to NWNG's lien. *See* ORS 87.146(1)(e) (lien created under ORS 87.226 has priority over a security interest created under ORS chapter 79).

■ The jury could also find that NWNG wanted to end its contractual relationship with a difficult customer and that it was willing to put Chase out of business to achieve that goal. Before writing the letter, NWNG's credit manager had warned his superiors that, if Chase stayed in business, NWNG would have to deal with it again the next year. The jury could find, both from expert testimony and from its own sense of the practical effects of NWNG's actions, that those actions made no business sense if NWNG's purpose was to collect what Chase owed. If that had been its purpose, it would have made it possible for Chase to get through its upcoming harvests, thus producing cash flow that would at least have reduced Chase's debt to NWNG.

■ The jury could find that, instead, NWNG decided to shut Chase down in order to get out of any continuing obligations under the contract and that it used the January 9 letter to achieve that purpose. The credit manager's later statement that his instructions were not to present any alternatives that involved releasing the lien would support that conclusion. Everyone knew that, so long as the lien was in effect, the bank would not advance any money to Chase and that, in that event, Chase would be unable either to operate or to pay NWNG anything.[10]

Filing the lien by itself was a legitimate attempt to collect the debt that Chase owed NWNG. Using the lien as a basis for making excessive demands, with the intent of putting Chase out of business by interfering with its relationship with the source of its operating capital, not in order to collect the debt but in order to get out of an existing relationship, was not. The jury could thus have found that the January 9 letter was an improper means and that the goal of putting Chase out of business in order to avoid having to continue an existing relationship[11] was an improper purpose.

---

[10] NWNG argues that there was no proof that any improper interference caused Chase's damages, because there was no proof that Chase could have paid the correct amount of the lien. NWNG failed to raise that argument in its motion for a directed verdict and thus has not preserved it for appeal. *Gardner v. First Escrow Corp.*, 72 Or App 715, 727-28, 696 P2d 1172, *rev den* 299 Or 314 (1985).

[11] The jury could thus find that NWNG had a specific purpose of injuring Chase that went well beyond the goal of protecting competitive interests that was involved in *Top Service Body Shop v. Allstate Ins. Co.*, 283 Or 201, 212, 582 P2d 1365 (1978).

▇ NWNG also assigns error to the trial court's submitting the issue of punitive damages to the jury. It argues that there was insufficient evidence of an aggravated violation of societal interests. *See Honeywell v. Sterling Furniture Co.*, 310 Or 206, 210-11, 797 P2d 1019 (1990); *Noe v. Kaiser Foundation Hosp.*, 248 Or 420, 425, 435 P2d 306 (1967). Even if NWNG preserved that issue in its motion for directed verdict, which is questionable, the evidence was sufficient to send the issue to the jury. Chase summarized some of that evidence in its brief:

> "[NWNG] solicited Chase's business, knowing that it had a seasonal cash flow. At the end of November, 1990, [NWNG]'s bill was down to $7,841. When unusual weather forced the bill up, [NWNG] preferred a 'nugatory' lien over real security in land. * * * [NWNG] demanded double the mistaken sum [of the lien] for the lien's release. [NWNG] chose to stand on a lien when a $518,256 harvest was only a month away. [NWNG] knew its conduct would 'close the doors' of Chase Gardens, but it preferred to force Chase into bankruptcy or receivership. Chase Gardens was a 100 year old family business. After it shut down, the utility phoned the bank and was smug."

Finally, NWNG failed to preserve any claim that the amount of the punitive damages was excessive. *See Oberg v. Honda Motor Co.*, 320 Or 544, 552 n 9, 888 P2d 8 (1995).

Affirmed.