Argued and submitted October 18, 1995, reversed in part and affirmed in part on appeal; affirmed on cross-appeal March 6, petition for review denied July 16, 1996 (323 Or 690)

## KLOKKE CORPORATION,
### a California corporation,
*Respondent - Cross-Appellant,*

*v.*

## CLASSIC EXPOSITION, INC.,
### an Oregon corporation;
### Vicki Nickens; Lowell Nickens;
### Classic Dimensional Graphics, Inc.,
### an Oregon corporation;
### and Classic Display, Inc.,
### an Oregon corporation,
*Defendants,*

*and*

### Floyd HAMBLETON,
*Appellant - Cross-Respondent.*

## (C920402CV; CA A85036)
912 P2d 929

Lee Aronson argued the cause for appellant - cross-respondent. With him on the briefs was Schulte, Anderson, Downes, Carter & Aronson, P.C.

Barton C. Bobbitt argued the cause and filed the briefs for respondent - cross-appellant.

Before Warren, Presiding Judge, and Edmonds and Armstrong, Judges.

WARREN, P. J.

## WARREN, P. J.

Defendant Floyd Hambleton, one of the two shareholders in defendant Classic Exposition, Inc., appeals a judgment that holds him personally liable for $80,000 of plaintiff Klokke Corporation's claims against Classic for its breach of a commercial lease. Hambleton also assigns error to the court's award of attorney fees under the lease, to the award of prejudgment interest, and to the rate of both prejudgment and postjudgment interest. Klokke cross-appeals, seeking to increase the amount of the judgment. On appeal, we affirm the judgment for damages, reverse the awards of attorney fees and prejudgment interest, and reduce the postjudgment interest to the legal rate. We affirm on the cross-appeal.

Because this case was tried to the court as an action at law, we state the facts consistently with the trial court's findings. *See Illingworth v. Bushong*, 297 Or 675, 694, 688 P2d 379 (1984); *Creager v. Berger*, 97 Or App 338, 342, 775 P2d 918 (1989). Before 1985, Lowell Nickens had worked in the business of providing services for trade shows for a number of years. In late 1984, he decided to establish his own company. Although he incorporated Classic for that purpose in January 1985, with his wife and himself as the directors, he had insufficient resources for the needs of the business. He turned to Hambleton, whom he had previously met through a mutual friend. Hambleton had been in the lumber business in Washington for almost 40 years, had a substantial net worth, and was interested in investing in other industries. He agreed to provide financial support for Classic, in return receiving 25 percent of Classic's stock and becoming one of the corporation's two directors. Nickens retained the remaining 75 percent of the stock and was the other director. The corporation's organizational meeting, at which these decisions were formally made, occurred in March 1985.

Nickens brought Classic a significant amount of business from his former employer; he also purchased equipment from it for $300,000. Classic had around 20 employees soon after it began business. Despite these obligations, Nickens and Hambleton agreed to pay a total of only $1,000 for their stock; it is not clear whether they actually paid even

that amount. Rather, Nickens and Hambleton "capitalized" Classic almost entirely with debt. The corporation borrowed $200,000 from a bank, which relied primarily on Hambleton's guaranty in making the loan; he also guaranteed a number of later bank loans and personally loaned the corporation additional amounts. The decision to invest only $1,000 in capital was based entirely on tax considerations, with no attention to the actual needs of the business in which the corporation intended to engage or to the liabilities that it was likely to incur.

Nickens had complete control of Classic's day-to-day operations; a corporate resolution gave him almost unlimited power over the company's business. He met with Hambleton about once a month to discuss its affairs; Hambleton also received monthly financial statements. Hambleton signed minutes, loan authorizations, and other operating documents as necessary, but the corporation's banker, lawyer, accountant, and all others involved with the business dealt exclusively with Nickens.

Classic showed profits in a few years and losses in others, but the volume of its business grew steadily and it branched out into related fields. In part because of the nature of its business, it had frequent cash flow problems, requiring it to rely on the bank and Hambleton for operating funds. In early 1990, Greyhound Exposition Services, which was then one of the largest businesses in the field and is now the largest, expressed interest in purchasing a major portion of Classic's business as a way of gaining entry to the Pacific Northwest. In order to facilitate the sale, Classic created subsidiaries into which it transferred certain portions of its business.[1] It then sold Greyhound the stock of the subsidiary that had the portion that interested it, the sale closing on April 16, 1990. The purchase price was $1,234,172, to be paid $734,172 at closing and the remaining $500,000 at later dates. As part of the transaction, Greyhound also entered into a consulting agreement with Nickens personally at $100,000 for one year and a noncompetition agreement with Nickens and Classic at $500,000, to be paid over five years.

---

[1] The details of the restructuring are not necessary to our decision.

Classic used part of the April 1990 payment to pay its creditors, including repaying Hambleton $151,273.50 that he had loaned it personally. It distributed the rest to Nickens and Hambleton, designating it as "salary"[2] for tax purposes. In addition to the repayment of his loans, Hambleton's share of the distribution was $137,598. He received $50,000 cash immediately, together with a note, due September 30, 1991, for the balance of $82,574.05.[3]

After the sale, Nickens sought new quarters for Classic's remaining business. Hambleton encouraged him to look for a smaller location, but instead in July 1990 Nickens entered into a ten-year triple net lease with Klokke for a complete building in Klokke's industrial park.

Classic received the second payment on the Greyhound sale in October 1990 and used it to pay a number of creditors rather than for working capital as originally intended. The bulk of the final payment, which Classic received in January 1991, met the same fate. In October 1991, Nickens arranged for Greyhound to prepay the balance due on the noncompetition agreement. This was the final money that Classic would receive from the sale. Nickens did so primarily because he needed money to pay his personal income taxes.[4] Hambleton insisted that, if Nickens were to use the money for that purpose, Classic should also pay off Hambleton's outstanding note. In October 1991, Classic therefore paid Nickens $117,000 and Hambleton $80,000.[5]

In November 1991, Klokke asserted that Classic was in default on the lease because of its failure to pay property taxes in full. Nickens and Klokke resolved that issue. In April 1992, Klokke again asserted that Classic was in default, this time for failure to pay the rent when it was

---

[2] Hambleton was never an employee of Classic and the basis for paying him a salary is unclear. We do not need to resolve that issue for the purpose of this opinion.

[3] The total of the immediate payment and the note is less than the amount of Hambleton's share because Classic withheld social security taxes from the payment as part of its attempt to treat the distribution as "salary."

[4] Nickens had previously withdrawn enough from Classic to repay the note that he received as part of the April 1990 distributions.

[5] The corporation originally treated the money that it paid Nickens as a loan but later changed it to salary.

due. Nickens was unable to resolve that issue, and Classic vacated the premises in June. Klokke suffered damages in excess of $500,000 as a result of Classic's default on the lease. It thereafter sued Classic, Nickens, and his wife, later amending its complaint to add two of Classic's subsidiaries and Hambleton as defendants. While the case was pending, all defendants except Hambleton and one of the subsidiaries filed bankruptcy petitions. The case proceeded to trial against Hambleton alone.[6] The trial court found that Hambleton was liable for $80,000 of Klokke's damages and entered judgment against him for that amount, together with attorney fees under the lease and prejudgment and postjudgment interest at the rate provided in the lease.

The primary issue in this case is whether Hambleton is liable to Klokke for Classic's debts and, if so, to what extent. Klokke does not assert that Hambleton expressly assumed any part of Classic's obligations to it; rather, it seeks to pierce the corporate veil to reach him in the capacity of a controlling shareholder. In order to do so, it must satisfy one of the grounds for overcoming the statutory grant of limited liability to corporate shareholders.

■    Under ORS 60.151(2), a shareholder of a corporation is not liable for the corporation's debts "merely by reason of being a shareholder." Limited liability is one of the major benefits of the corporate form of business organization. In order to obtain that benefit, however, the shareholders must comply with the obligations that accompany the legislature's grant of corporate status. One of the most important of those obligations is that the shareholders invest unrestricted capital in the corporation that is reasonably sufficient for its expected business. A shareholder is not entitled to avoid liability to corporate creditors at no risk whatever to the shareholder. The statute provides limited liability, not the absence of any possible liability whatever.

> "*The corporate form was not intended to be a device by which persons could engage in business without obligation or risk.* The privilege of limited liability of the shareholders

---

[6] Klokke dismissed its claims against the remaining defendant after the trial.

of a business corporation carries with it the obligation to conduct business as a corporation, and abuse of the privilege may create personal liability for the act of the corporation." *Amfac Foods v. Int'l Systems*, 294 Or 94, 101, 654 P2d 1092 (1982) (emphasis supplied).

█    In *Amfac Foods* the Supreme Court discussed the various theories under which a corporate shareholder or officer may be subject to direct liability for corporate debts. It adopted the following rule for piercing the corporate veil:

> "When a plaintiff seeks to collect a corporate debt from a shareholder by virtue of the shareholder's control over the debtor corporation rather than on some other theory, the plaintiff must allege and prove not only that the debtor corporation was under the actual control of the shareholder but also that the plaintiff's inability to collect from the corporation resulted from some form of improper conduct on the part of the shareholder." 294 Or at 108.

Thus, a shareholder may be personally liable for a corporate debt if the shareholder (1) actually controlled the corporation and (2) engaged in improper conduct that (3) caused the corporation to default on the obligation in question. *Id.* at 109.

█    The first two kinds of improper conduct that the court described in *Amfac Foods* are directly relevant to this case: (1) inadequate original capitalization for the corporation and (2) subsequent milking the corporation by excessive dividends. *Id.* In our discussions of undercapitalization since the decision in *Amfac Foods*, we have emphasized that "a corporation must have sufficient capital to cover its reasonably anticipated liabilities, measured by the nature and magnitude of its undertaking, the risks attendant to the particular enterprise and normal operating costs associated with its business." *Gardner v. First Escrow Corp.*, 72 Or App 715, 723, 696 P2d 1172, *rev den* 299 Or 314 (1985); *see also Stirling-Wanner v. Pocket Novels, Inc.*, 129 Or App 337, 341-42, 879 P2d 210, *rev den* 320 Or 272 (1994); *Rice v. Oriental Fireworks*, 75 Or App 627, 634, 707 P2d 1250 (1985), *rev den* 300 Or 546 (1986). Because loans to the corporation do not increase the worth of the corporation or the assets available to conduct its business, they are not part of its capitalization. *Gardner*, 72 Or App at 723. A corporation is undercapitalized if the shareholders do not place at

risk assets that are reasonably related to the corporation's anticipated business and liabilities. *See also Salem Tent & Awning v. Schmidt*, 79 Or App 475, 482-83, 719 P2d 899, *rev den* 302 Or 36 (1986) ($5,000 stated capitalization, with $1,559 actually paid, may be inadequate for corporation that immediately borrowed $50,000 and spent $62,000).[7]

■       There can be no doubt that, as the trial court found, Classic was undercapitalized at its formation and continued to be undercapitalized until the Greyhound sale. A total capital of $1,000, which the shareholders may not even have paid, is completely inadequate to the magnitude and risks of the undertaking that Classic contemplated and to the normal operating costs associated with its intended business. That amount was not even an attempt to provide adequate capitalization; rather, it was the result of Classic's decision, for tax reasons, to have a merely nominal capitalization. In allowing tax considerations to control that decision, Classic exposed its shareholders to potentially unlimited liability for its normal business debts.

The evidence also supports the trial court's additional finding that Classic ceased to be undercapitalized in April 1990, when it received the first payment on the Greyhound sale. That money was sufficient to satisfy Classic's minimum capitalization requirements, even after paying outside creditors. However, Nickens and Hambleton immediately withdrew effectively all of it, leaving Classic again without sufficient capital. Indeed, each also received a promissory note entitling him to substantial additional amounts. Classic used the remaining payments on the sale to pay creditors rather than to restore what Nickens and Hambleton had withdrawn in April. Sometime in this period Nickens also withdrew well over $100,000 in payment of his promissory note.[8] Finally, the October 1991 prepayment on

---

[7] We may have suggested that a corporation may partially meet these obligations by obtaining appropriate insurance, *see Salem Tent & Awning*, 79 Or App at 482, *Rice v. Oriental Fireworks*, 75 Or App 627, 634, 707 P2d 1250 (1985), *rev den* 300 Or 546 (1986). Even if that option might be available in other circumstances, there is no suggestion that Classic had any insurance that would protect Klokke from the effects of Classic's default on the lease.

[8] The trial court found that by October 1991 Nickens had withdrawn all amounts necessary to repay the promissory note that he received in April 1990.

the noncompetition agreement went to redeem the promissory note that Hambleton had received as part of the April 1990 distribution and to provide Nickens additional money for his personal needs. It thus completed the process by which Nickens and Hambleton took the entire benefit of the Greyhound sale for themselves, leaving the corporation as poorly financed as it had been at its organization.[9]

Hambleton argues that he was as entitled to payment on the note as any other creditor would be. That argument ignores that the note had nothing to do with any services that he performed or money that he loaned. Rather, it originated in a distribution to the stockholders that was, in effect, the payment of a dividend. The amount of the distribution was such that it drained Classic of the capital that the Greyhound sale would otherwise have provided. Classic did not give Hambleton the note for value received but as part of the process of depriving the corporation of its assets. That might have been unobjectionable for a partnership, in which the partners retained their unlimited personal liability; it is, however, inconsistent with maintaining the limited liability that is part of the corporate form.

The trial court found that, although Nickens generally made most of the financial decisions concerning Classic, the corporation was under Hambleton's control in his withdrawal of $80,000 in October 1991. "Hambleton merely had to suggest to Nickens that he should get his money first before Nickens withdrew $117,000 for taxes, and it was done." The court's other findings make it clear that that withdrawal was improper and that it was a direct cause of Classic's default on the Klokke lease in April 1992. There is evidence to support all of these findings.

The trial court specifically found that "the withdrawals by Nickens ($117,000) and Hambleton ($80,000) in October 1991 were a direct cause of Classic's subsequent default to Klokke in April 1992" and that "Hambleton's withdrawal of the $80,000 in October 1991 was improper and left

---

[9] The trial court expressly found that Hambleton knew that Classic was not in good financial shape when he received the $80,000 payment in October 1991.

the company with a greatly reduced ability to meet its financial obligations." Those findings were based primarily on the testimony of plaintiff's expert accountant. The accountant testified that, if the company had been properly capitalized at the beginning, the shareholders could have taken out significant amounts and it would still have been in sound financial condition. As it was, Classic was insolvent in several years and had adequate equity only in 1990, the year of the Greyhound sale. Although Classic was financially sound that year, the shareholders immediately reversed the situation by the money that they took out in 1991. The 1991 payments to the shareholders, the accountant testified, caused the corporation to be unable to pay its current obligations, including the amounts owed on the lease to plaintiff. Nothing that happened afterward changed the situation — the company was only breaking even in the first part of 1992.

The accountant prepared balance sheets for the corporation as they would have appeared if Nickens and Hambleton had not received the October 1991 payments. Those balance sheets showed that on April 30, 1992, the corporation would have had excessive cash, permitting Classic to have made distributions to Nickens and Hambleton without damaging its ability to pay its bills. However, the amounts that the shareholders actually took were so excessive that they left it with a negative cash balance at the end of October 1991, even though it started the month with a small positive balance and received over $220,000 from the Greyhound sale during the month. The accountant concluded that what he described as the "milking" of the corporation after the sale destroyed Classic's ability to pay its creditors.

This testimony, in conjunction with the other evidence, painted a picture of a company that was severely undercapitalized from the beginning, that had an opportunity to gain adequate capitalization while still distributing reasonable amounts to its owners, but that instead channeled all of the available financial benefit from the Greyhound sale to the shareholders at the expense of the corporation and those with whom it did business. The court

could properly find from this evidence that the October withdrawals put the corporation in a precarious financial condition and that its default on the lease was a direct result of that condition.

The real issue here is not the primary issue on the appeal — whether Hambleton is liable at all — but the issue on the cross-appeal — whether the court properly limited that liability to the $80,000 that he received in October 1991. That is an issue of fact concerning the extent of Hambleton's control over Classic and the causal connection between his improper use of that control and Klokke's damages.

■ As the Supreme Court recognized in *Amfac Foods*, determining the damages that flow from improper capitalization or milking may create significant factual issues. 294 Or at 111 n 18. In this case the court, as the trier of fact, might have reached one of several conclusions. It could have found that, by participating with Nickens in depriving Classic of all of the proceeds of the Greyhound sale other than what went to pay outside creditors, Hambleton had helped to render it financially incapable of fulfilling its obligations under the lease, thus causing the default and all of Klokke's resulting damage. Alternatively it might have focussed on the money that both Hambleton and Nickens withdrew in October 1991 and found that Hambleton's acquiescence in both withdrawals meant that he was responsible for Classic's inability to pay $197,000 of Klokke's damages. The court instead adopted a third approach that limited Hambleton's liability to what he actually received in October. There is evidence to support its factual decision.

It is undisputed that Nickens dominated Classic's business affairs in most matters. A corporate resolution expressly gave him almost unlimited control over business decisions. As one example, Nickens entered into the Klokke lease against Hambleton's advice and without informing him until some time later. Although Hambleton, if he had wanted to assert his authority as a director and as Classic's primary financial backer, might have been able to exercise greater control, in fact he seldom did so. Thus, the trial court could have properly found that Hambleton's insistence on receiving the $80,000 was the only exercise of control that caused

damage to Klokke, that Nickens' concurrent withdrawal of $117,000 was a major cause of Klokke's full damages, and that Hambleton's misconduct therefore damaged Klokke only in the amount that he actually received. Because that finding is supported by the evidence, we are bound by it on appeal.[10]

■      Hambleton also assigns error to the trial court's award of attorney fees to Klokke under the lease between Klokke and Classic. We have held that shareholders may be liable for attorney fees under a contract with the corporation if they are personally liable for corporate obligations on an alter-ego theory. *Salem Tent & Awning*, 79 Or App at 483. The foundation of that holding is that the shareholders and the corporation may be so closely identified that the shareholders may properly be held liable as parties to the contract. In this case, however, Hambleton is not the dominating shareholder of Classic and the court did not find him liable for all of Klokke's damages for Classic's breach of the lease. It did not, therefore, treat him as a party to the lease. As a result, he is not liable for attorney fees under it.[11]

Hambleton next assigns error to the trial court's award of prejudgment interest and to its use of the contract rate of 12 percent for both prejudgment and postjudgment interest. Klokke is entitled to prejudgment interest beginning when the amount due became ascertained or readily ascertainable. *Public Market Co. v. Portland*, 171 Or 522, 621, 103 P2d 624, 138 P2d 916 (1943). Its damages consist of missed rental and other payments under the lease and the costs of remodeling the building in order to mitigate its

---

[10] Hambleton, *citing Carlesimo v. Schwebel*, 87 Cal App 2d 482, 197 P2d 167 (1948), argues that Klokke's failure to investigate Classic's financial condition before entering into the lease prevents it from holding Hambleton liable for Classic's subsequent default. It is not at all clear that the case stands for that proposition. However, even if we were to import contributory negligence concepts into this context, the misconduct for which Hambleton is liable — insisting on payment for the note — occurred after Classic and Klokke entered into the lease. There is thus no causal connection between any failure to investigate and Klokke's damages.

[11] Klokke points out that our reference in *Salem Tent & Awning* to an "alter-ego theory" may be anachronistic after *Amfac Foods*. For these purposes, however, the point is that Klokke was not successful in piercing the veil sufficiently to hold Hambleton liable to it without limit. We cannot, therefore, say that he is liable as a party to the lease.

damages by rerenting it. Klokke did not incur those damages at the moment of the default but over a period of time. Although the parties stipulated to the total amount of damages as of the time of trial, there is nothing in the record that shows when each portion accrued. As a result, there is no basis for the court to determine when Klokke's damages became ascertainable. It therefore erred in awarding prejudgment interest. Finally, because Hambleton is not liable directly on the contract, the court erred in using the contractual rate rather than the legal rate of nine percent under ORS 82.010 in determining postjudgment interest.

On appeal, awards of attorney fees and prejudgment interest reversed; postjudgment interest reduced to the legal rate of nine percent; otherwise affirmed. Affirmed on cross-appeal.