**ACRYMED, INC., an Oregon corporation, and Medline Industries, Inc., an Illinois corporation, Plaintiffs and Counterdefendants,**

v.

**CONVATEC, an unincorporated division of E.R. Squibb & Sons, LLC, a Delaware Limited Liability Company fka E.R. Squibb & Sons, Inc., and Bristol–Myers Squibb Company, a Delaware Corporation, Defendants and Counterclaimants.**

No. CIV. 03–741–AS.

United States District Court, D. Oregon.

May 14, 2004.

---

D. Roland, Sedgwick, Detert, Moran & Arnold LLP, San Francisco, CA, Elizabeth A. Schleuning, Schwabe Williamson Wyatt, PC, Portland, OR, Stevan J. Bosses, Thomas H. Beck, Fitzpatrick, Cella, Harper & Scinto, New York City, for Defendants.

## OPINION AND ORDER

ASHMANSKAS, United States Magistrate Judge.

This case centers around a new technology which incorporates silver, an infection-fighting compound, into a wound dressing. Both parties are asserting that the other stole confidential information or "trade secrets" and incorporated that information into their product.

Currently before the court are motions for summary judgment against virtually all of the claims and affirmative defenses asserted by the parties, with the exception of the affirmative defenses relating specifically to the patent infringement claim. Additionally, the parties have presented their proposed claim construction with regard to the contested terms in the patent in question. In this opinion, the court will address all of the non-patent claims and will reserve discussion of the patent claims and the claims construction for a separate opinion.

*Background*

Plaintiff AcryMed, Inc., is an Oregon biomaterials and medical device company that specializes in the development and manufacture of advanced tissue repair products from its patented core technologies ("AcryMed"). Plaintiff Medline Industries, Inc., an Illinois corporation, is the exclusive distributor and licensee of advanced wound dressings combining AcryMed's polyacrylate and antimicrobial silver technology products in the United

Edward F. McCormack, Nick Kahlon, Jenkens & Gilchrist, Chicago, Il, Renee E. Rothauge, Susan Lee Ford, Bullivant Houser Bailey, PC, Stephen F. English, Bullivant Houser Bailey Pendergrass & Hoffman, Portland, OR, Robert W. Busby, Jr., W. Jackson Matney, Jr., Jenkens & Gilchrist, Washington, DC, for Plaintiffs.

Amber M. Rye, Kevin A. Hughey, Randall G. Block, Sigrid Owezarek, Steven

States ("Medline")(both plaintiffs will be collectively referred to as "Plaintiffs").

Defendant ConvaTec ("ConvaTec") is an unincorporated division of defendant E.R. Squibbs & Sons, L.L.C. ("Squibbs"), which is a fully owned subsidiary of defendant Bristol–Myers Squibb Company ("Bristol–Myers")(all defendants will be collectively referred to as "Defendants"). ConvaTec designs, manufactures and sells medical products, including ostomy and wound and skin care products. ConvaTec has established a line of wound care products which, as of 1995, included a wound dressing known as AQUACEL®. The base material for AQUACEL® is a product called Hydrocel® which is made by Accordis Specialty Fibres Ltd. ("Accordis"). Hydrocel is a specially treated form of Tencel®, which is a cellulose fiber commonly used in making clothing. The Tencel® is partially carboxylated, that is, carboxymethyl groups are added chemically to some, but not all of the available reactive sites on the cellulose molecules, so that when the Tencel® is turned into Hydrocel®, it is a fiber that has a mixture of the properties of cellulose and of sodium carboxymethylcellulose.

In the late 1990's, ConvaTec was interested in developing a technology that would allow it to incorporate silver into AQUACEL® and had, in fact, engaged in some internal research toward this end. In September 1999, Phillip Bowler, the chief scientist responsible for internally developing the silver technology for ConvaTec, expressed a sense of urgency about developing an antimicrobial wound dressing before the September 2000 sales meeting and directed a number of ConvaTec scientists to research the options. As of early 2000, ConvaTec had discovered a possible silver antimicrobial chemistry but was not satisfied with either the color or the light stability of the product. Elizabeth Jacques, a ConvaTec scientist working on the silver technology, was looking at utilizing a silver chloride solution in January 2000, but was finding the resulting particulates to be problematic.

About this same time, AcryMed introduced a revolutionary technology for dispersing a silver salt ("silver chloride" or "AgCI") into a polyacrylate matrix, resulting in a light-stable, sustained-release, antimicrobial wound dressing. This technology was revolutionary because is permitted the silver antimicrobial agent to release over time, and prevented the silver from discoloring the wound dressing when exposed to light. AcryMed applied to the United States Food and Drug Administration for clearance to market the new product as "AcryDerm Silver Antimicrobial Wound Dressing" which is now sold as Silvasorb® ("AcryDerm"). AcryMed also filed a provisional patent application with the United States Patent and Trademark Office to protect the new technology on October 1, 1999 (the "Application"). The Application specifically described a two-step process for impregnating a wound dressing with silver. First, a silver solution is prepared by dissolving silver nitrate into water and, second, the silver solution is added to a stirred batch material containing chloride. This preparation forms a fine precipitate of silver chloride in the batch mix. Following polymerization of the mix, the silver chloride is distributed throughout a polyacrylate wound dressing.

ConvaTec approached AcryMed at a trade show and expressed an interest in its silver technology. Bruce Gibbins, AcryMed's Chairman and Chief Technology Officer, followed up the contact with a letter dated February 8, 2000, addressed to Brian Andrews, the chemist primarily responsible for the work on ConvaTec's antimicrobial dressing. Gibbins informed Andrews of the new technology found in

AcryDerm and of AcryMed's desire to partner with an established company to market AcryMed's products utilizing the new technology. Gibbins also provided ConvaTec with a product specification sheet, a product description and position statement, two samples of AcryDerm dressings, and a copy of a poster presentation.

On February 28, 2000, Carol A. Marino, ConvaTec's Vice President of External Development, signed and forwarded to Gibbins a Confidential Disclosure Agreement (the "Agreement") which provided:

We, ConvaTec, a Division of E.R. Squibb & Sons, Inc., have been informed that you are in possession of certain information relating to silver antimicrobial wound dressing technology, which you consider confidential and in which you claim to have a proprietary interest. We understand that you are willing to disclose such information to us for purposes of our evaluation and determination of our possible interest therein.

We have an expertise in the design, manufacture and sale of medical products including ostomy, wound and skin care, continence care, and pharmasurgical products. In order for you and us to evaluate and determine whether it would be in our mutual interest to enter into a joint effort, it will be necessary that each party disclose to the other information which it may regard as confidential and in which it may claim to have a proprietary interest.

Both parties agree to receive such information from the other, and disclose such information to the other, during the term of this Agreement on the following basis:

1. Each party will hold in confidence any and all information disclosed to it by the other party under this Agreement, except:

(a) information which at the time of disclosure is in the public domain;

(b) information which, after disclosure, becomes part of the public domain by publication or otherwise, except by breach of this Agreement, by the receiving party;

(c) information which the receiving party can establish by competent proof was in its possession at the time of disclosure by the disclosing party, and which was not acquired, directly or indirectly, from the disclosing party;

(d) information which is received by the receiving party from a third party, provided, however, that such information was not obtained by said third party, directly or indirectly, from the disclosing party; or

(e) information which the receiving party can establish by competent proof was developed by or on its behalf independently of any disclosure made under this Agreement.

2. Each party agrees that it will not use the information disclosed, which is required hereunder to be kept confidential, for any purpose other than the aforesaid evaluation without first entering into an agreement with the other party covering the use thereof.

3. The obligations of both parties under the Agreement shall expire five (5) years from the date on which you accept this Agreement. Both parties agree that, after such date, no claim will be made with respect to this Agreement, except for patent infringement.

If you agree to the foregoing, kindly indicate your acceptance thereof and as-

sent thereto by signing and dating the duplicate copies of this letter in the space provided for below, returning such signed copy to us.

Gibbons signed the Agreement on March 3, 2000, and it became effective on that date.

On March 24, 2000, Lance Hopman, an AcryMed scientist, attempted to add AcryMed's silver technology to wound dressings already on the market, including AQUACEL®. His primary concern at the time was determining the solubility of silver salts and chloride and incorporating that with the materials used in the wound dressings. He was successful in adding the silver technology to AQUACEL®.

On March 29, 2000, Bowler and Brian Andrews, of ConvaTec, met with Gibbins and Jack McMaken, of AcryMed, at AcryMed's facilities in Oregon. Gibbins introduced AcryMed's new silver technology and the resulting AcryDerm, which they were interested in distributing through ConvaTec. Bowler and Andrews explained that they were really on a shopping trip to find a silver antimicrobial agent that could be added to AQUA-CEL®.[1] Bowler questioned whether the silver technology would work with AQUA-CEL®. Gibbins responded that it would and provided Bowler with a sample of AQUACEL® with the silver technology added to it by Hopman the previous week.

Gibbons testified that he explained to Bowler and Andrews the entire process used to suppress the ionic silver present in AcryMed's silver technology, which included using chloride ions in a matrix with a little copper or iron as an oxidizer. Gibbons felt that the use of a surplus of chloride ions was unique and was confidential information. He stated that he reminded Bowler and Andrews that silver chlorides were weakly soluble and described how they were able to get the silver technology into Aquacel® with causing gelling of the dressing by using organic solvents, including alcohol, to add the silver and chloride.

Bowler testified that he considered the information he received at the meeting to be in the public domain and, therefore, not confidential, with the exception of his observation of the manufacture of AcryDerm in AcryMed's labs. He also denies learning about the use of silver chloride as an active agent until after this litigation began or discussing AcryMed's silver technology with either Dave Parsons or Elizabeth Jacques, the scientists at ConvaTec responsible for researching and developing ConvaTec's silver technology. Andrews testified that Bowler stated he needed to obtain detailed knowledge of the chemistry of the AcryMed product so that he could adequately test and validate the sustained nature of the silver delivery in the wound dressing.

Bowler considered AcryMed's dressings to be superior to the others he had seen. The individuals began discussing the possibility of a co- or joint-development agreement for an AQUACEL® product incorporating the silver technology. While Bowler and Andrews knew that ConvaTec had been working on its own silver technology and had a strong preference to develop an antimicrobial dressing internally, they never shared this strong preference to develop the technology internally to either Gibbins or McMaken.

On March 31, 2000, after returning home, Bowler forwarded additional AQUA-CEL® samples for AcryMed to impregnate with the silver technology. Bowler also provided a description of the process that they had used on AQUACEL®, which

---

1. In fact, AcryMed was the second facility that they visited on this trip. Bowler and Andrews also visited a company named Wes-taim that was researching and producing an antimicrobial silver wound dressing.

consisted of preparing the chemistry in a neat industrial methylated spirit, soaking the dressing for one hour, blotting dry on absorbent paper and air drying in a suitable cabinet. He then asked AcryMed to return at least ten samples for testing by ConvaTec. There is no evidence about when this letter and the samples were received by AcryMed.

On April 3, 2000, Hopman conducted a second experiment to improve the method of incorporating the silver technology into AQUACEL®. This time, he added the presence of copper to aid in the color stability of the product.

On April 6, 2000, McMaken e-mailed Andrews and expressed his enthusiasm about the possible joint venture between AcryMed and ConvaTec as well as his agreement with ConvaTec's desire to "fast track" the evaluation of the viability of the relationship. McMaken indicated that he felt comfortable that the Agreement covered the sharing of information about the silver technology with regard to the evaluation of the AcryDerm line of dressings. However, he felt that a co-development agreement was necessary with regard to the sharing of technology for the AQUACEL® project, or the incorporation of the silver technology into other ConvaTec products. "I think we will need that for both of us to feel comfortable regarding our IP rights." The next day, McMaken agreed to forward additional samples of AQUACEL® impregnated with the silver product and specifically referred to them as "CONFIDENTIAL prototypes."

On April 12, 2000, Bowler forwarded some more pieces of AQUACEL® to Gibbins "as promised" and asked for some more samples "now that you have perfected the incorporation of silver to some extent." Bowler also asked that AcryMed incorporate silver "at a range of concentrations to a maximum point that does not cause discoloration in any way."

Sometime during this time period, David Parsons, ConvaTec's primary chemist, expressed his concern to Bowler that his involvement in both the internal testing for a viable silver product and the testing of AcryMed's silver product created a possible conflict of interest. Parsons was concerned that he could learn something from his work on AcryMed's product that would be helpful in resolving the problems that still existed with ConvaTec's product. Bowler agreed that a potential conflict existed and advised Parsons to restrict his involvement in the AcryMed project. This information was not passed on to Jacques.

In late May 2000, Gibbins e-mailed Bowler to discuss the framework of the research and development agreement needed to complete the work on the AQUACEL® silver project. Gibbins proposed that the agreement would start sometime after the "proof in principle" stage "since everybody is comfortable that our technology will go into your AQUACEL® and preserves its photo resistance, sustained release and biocidal activities." Gibbins thought it appropriate for AcryMed to continue developing the technology with ConvaTec concentrating on testing. The cash support, including up front fees, expense reimbursements and "exclusivity's" were to be left up to the "contract guys." As of this date, ConvaTec did not have any money to pay AcryMed for its work incorporating its silver product into AQUACEL®.

In early June 2000, Bowler requested more samples from AcryMed explaining that with the extensive testing they were doing, they would need at least ten 10x10 dressings for each prototype. Acrymed was providing prototypes with differing concentrations of silver and ConvaTec was testing to determine the optimum concentration. Bowler also recommended that AcryMed use two or three different meth-

ods of sterilization to determine the effect of each method on the silver impregnated AQUACEL® samples. Testing done by AcryMed on the AQUACEL® prototypes in late June revealed minute deposits which were analyzed by x-ray and determine to be silver with a bit of zinc. Gibbins surmised that the zinc came from the AQUACEL®, as it was not a component of the silver process. The analysis also showed significant levels of chromium and copper. On June 19, 2000, AcryMed filed a second provisional patent application for its new silver technology which provided, among other things, specific examples of impregnating the commercial product AQUACEL® with the metal colloid, silver chloride, by treating it with components dissolved in organic solvents (such as alcohols)(the "Second Application").

In July 2000, Bowler expressed concerns that the new samples seemed to be of poorer quality than usual with less loft and more discoloration. Gibbins attributed the changes to the raw AQUACEL® material provided by ConvaTec and the haste in which they were treated in light of ConvaTec's request for a quick turnaround. An e-mail dated August 24, 2000, from Bowler to Gibbins, indicated that the newest samples "certainly look much better quality."

On August 31, 2000, representatives from the two companies met to the discuss the details of the joint development agreement for the AQUACEL® silver product as well as the distribution of AcryDerm Silver by ConvaTec. A counter proposal was made by letter on September 5, 2000, with an e-mail following shortly thereafter.

In early September, either Bowler or Michael Lydon advised Andrews that ConvaTec had developed a technology for putting the internally developed silver product into AQUACEL®. On September 11, 2000, a meeting was held to determine ConvaTec's best option for the development of an antimicrobial wound dressing. The meeting was attended by Geoffrey Morris, Ron Roveda, Lydon, Andrews, and Bowler. Bowler presented three options, which were to: 1) internally develop a silver technology that could be incorporated into its AQUACEL® product with help from Accordis; 2) continue the relationship with AcryMed; or 3) initiate a relationship with Westaim. Bowler testified that at the time of the meeting, he was concerned about the lack of improvement in the AcryMed prototype. He felt that the product was too stiff, that the thinner dressing resulted in a decrease in loft and that the color was variable. Bowler recommended that ConvaTec pursue the internal development option and, with the lead of Morris, this was the option selected.

On September 14, 2000, a representative of ConvaTec contacted McMaken to inform him that ConvaTec would not be continuing its relationship with AcryMed. The representative explained that ConvaTec was just going in a different direction. McMakin immediately sent a letter asking that ConvaTec return or destroy all materials provided to ConvaTec by AcryMed. ConvaTec eventually confirmed that this request had been complied with. However, in late 2003, ConvaTec provided a number of AcryMed prototypes to its legal counsel.

The same day ConvaTec decided to end its relationship with AcryMed, Tim Hulme, a ConvaTec scientist, was asked to perform testing on the AcryMed products to determine their chemical composition. He specifically looked for nitrate compounds and chloride. Similar testing was completed on AcryMed's AQUACEL® prototype on September 14, 2000.[2] Hulme continued his testing through October 18, 2000.

2. Bowler stated that testing of the nitrate lev- els in AcryMed's AQUACEL® prototypes was

On October 2, 2000, Elizabeth Jacques turned her attention back to ConvaTec's internal silver technology for the first time since February 28, 2000. She did not remember why she decided to pick up the project up again. She testified that based on her understanding of silver solutions and their solubility in ammonia, she looked to ammonia solutions to remedy the color problems. She added ammonium chloride to ConvaTec's silver product and noted that the color was silver gray, more homogenous and more stable in light.

ConvaTec further tested and developed this process and eventually applied for approval from the United States Food and Drug Administration for a two-step process involving silver nitrate and sodium chloride in an alcohol solution. ConvaTec subsequently applied for a patent on the same process.

### Legal Standard

Rule 56 of the Federal Rules of Civil Procedure allows the granting of summary judgment:

> if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.

Fed.R.Civ.P. 56(c). "[T]he requirement is that there be no *genuine* issue of *material* fact." *Anthes v. Transworld Systems, Inc.,* 765 F.Supp. 162, 165 (D.Del.1991) (citing *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247–48, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986))(emphasis in original).

The movant has the initial burden of establishing that no genuine issue of material fact exists or that a material fact essential to the nonmovant's claim is absent. *Celotex v. Catrett,* 477 U.S. 317, 322–24,

106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). Once the movant has met its burden, the onus is on the nonmovant to establish that there is a genuine issue of material fact. *Id.* at 324, 106 S.Ct. 2548. In order to meet this burden, the nonmovant "may not rest upon the mere allegations or denials of [its] pleadings," but must instead "set forth specific facts showing that there is a genuine issue for trial." Fed.R.Civ.P. 56(e); see *Celotex,* 477 U.S. at 324, 106 S.Ct. 2548.

An issue of fact is material if, under the substantive law of the case, resolution of the factual dispute could affect the outcome of the case. *Anderson,* 477 U.S. at 248, 106 S.Ct. 2505. Factual disputes are genuine if they "properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." *Id.* at 250, 106 S.Ct. 2505. On the other hand, if after the court has drawn all reasonable inferences in favor of the non-moving party, "the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." *Id.* at 249–50, 106 S.Ct. 2505 (citations omitted).

### Discussion

**DEFENDANTS' MOTION FOR SUMMARY AGAINST PLAINTIFFS' COMPLAINT**

**Bristol–Myers Squibb Company as a Defendant**

 Plaintiffs allege that "ConvaTec is an unincorporated division of Squibb, which is a fully-owned subsidiary of Bristol–Myers." Plaintiffs have named all three of these entities as defendants and seek to hold all of them liable for the wrongful conduct alleged in the complaint. Defendants assert that Bristol–Myers is entitled to summary judgment because it

performed after September 12, 2000.

had no involvement in the actions leading to the dispute and it cannot be held liable for the actions of ConvaTec.

Plaintiffs contend that Bristol–Myers was directly involved in the actions of ConvaTec. In support of this assertion, Plaintiff presents evidence that Bristol–Myers claims ConvaTec and its products as a "core business" on its website and that the Bristol–Myers chairman reported to shareholders in 2002 that Bristol–Myers landed several important new products, including AQUACEL® Ag. Plaintiff also points to testimony by ConvaTec president Gary Restani that "[w]e are all employees of Bristol–Myers" and evidence that all ConvaTec employees are paid with Bristol–Myers checks.

There is no dispute that ConvaTec is a division of Squibbs, which is an independent corporation, though fully-owned by Bristol–Myers. The primary document upon which this action is grounded is the Agreement which was entered into by Carol A. Marino, vice president of external development for "ConvaTec, a Division of E.R. Squibb & Sons, Inc." The Agreement was prepared on ConvaTec letterhead with an indication on the lower part of the first page that ConvaTec is a Bristol–Myers Company. While a number of e-mails from ConvaTec listed Bristol–Myers as the "Organization," it is clear from the correspondence that AcryMed knew it was dealing with ConvaTec and not Bristol–Myers. In fact, the first letter from AcryMed to Defendants was addressed to Andrews at ConvaTec and referred to ConvaTec as the entity interested in AcryMed's silver technology.

In the absence of Bristol–Myers' understandable interest in the products of its subsidiaries and its funding of those subsidiaries, there is no evidence that Bristol–Myers was an active participant in the relationship between AcryMed and ConvaTec. Bristol–Myers is not directly liable to Plaintiffs for the wrongdoing alleged in the complaint.

Even when a parent corporation is not directly involved in the actions leading to litigation, it may be held liable for the acts of a subsidiary if the plaintiff can establish that the parent company was using the subsidiary to further a fraudulent or improper scheme. This is called "piercing the corporate veil."

To pierce a corporate veil and impose liability on the parent corporation, a plaintiff must plead and prove that: (1) the parent corporation controlled the subsidiary; (2) the parent corporation engaged in improper conduct in its exercise of control over the subsidiary; and (3) the parent corporation's improper conduct caused the plaintiff's inability to obtain an adequate remedy from the subsidiary. *Rice v. Oriental,* 75 Or.App. 627, 633, 707 P.2d 1250, rev. denied, 300 Or. 546, 715 P.2d 93 (1986), citing *Amfac Foods, Inc. v. International Sys. and Controls Corp.,* 294 Or. 94, 108, 654 P.2d 1092, (1982); see also *Klokke Corp. v. Classic Exposition, Inc.,* 139 Or.App. 399, 405, 912 P.2d 929, rev. denied 323 Or. 690, 920 P.2d 549 (1996).[3] Examples of improper conduct include inadequate capitalization, milking, misrepresentation, commingling of funds, and holding out. *Amfac,* 294 Or. at 109–10, 654 P.2d at 1102–03. Once the plaintiff has shown improper conduct by the controlling shareholder, he must then "demonstrate a relationship between the misconduct and the plaintiff's injury." *Id.* at 111, 654 P.2d 1092. Oregon courts are "extremely reluc-

**3.** Defendants note that there is some question about whether the laws of the State of Oregon, Delaware or New Jersey should apply. However, they concede that the ultimate outcome is the same in any of these jurisdictions and proceed with their argument applying the laws of the State of Oregon.

tant to disregard the corporate form unless exceptional circumstances exist." *City of Salem v. HSB,* 302 Or. 648, 655, 733 P.2d 890 (1987). Limited liability is the rule, not the exception. *Amfac,* supra, 294 Or. at 102, 654 P.2d 1092.

Plaintiffs have not alleged that Bristol–Myers engaged in any improper conduct in its control over ConvaTec or that they are unable to obtain adequate remedy against ConvaTec and Squibbs. Plaintiffs have failed to state a viable claim against Bristol–Myers and Bristol–Myers is entitled to summary judgment on all of Plaintiffs' claims against it.

**Breach of Contract Claim**

 To state a viable claim for breach of contract, a plaintiff must allege: 1) the existence of a specific contract and the relevant terms; 2) the plaintiff's full performance of the contract; 3) defendant's breach of the contract; and 4) damages to plaintiff resulting from the breach. *Fleming v. Kids and Kin Head Start,* 71 Or. App. 718, 721, 693 P.2d 1363 (1985). Defendants argue that Plaintiffs have failed to present evidence that ConvaTec used or divulged confidential information it obtained from AcryMed during the pendency of the Agreement. Accordingly, Defendants argue that there is no evidence that they breached the terms of the Agreement.

Plaintiffs allege that ConvaTec used confidential information about the use of a chloride solution to stabilize the color of the silver solution on the dressing.[4] The record shows that as of February 2000, ConvaTec was unable to discover the means to stabilize or lighten the color of its silver technology and that this was, in part, the reason for agreeing to consider a

partnership with AcryMed. Jaques, who was a ConvaTec scientist working on the technology, was looking at silver chloride to solve the problem but was having trouble with particulates formed as a result.

In March 2000, Gibbins met with Bowler to discuss the technology. Gibbins represents that he divulged the use of a chloride solution to solve the discoloration problems. ConvaTec stopped all experiments on its silver process and turned its attention toward the AcryMed process, testing numerous samples of AQUACEL® impregnated by AcryMed with its silver technology. On September 11, 2000, ConvaTec decided not to partner with AcryMed and, instead, to concentrate on its internal technology instead, despite the fact that such technology was still suffering from discoloration. That very same day, a ConvaTec scientist was asked to test the AcryMed products provided to ConvaTec pursuant to the terms of the Agreement, to determine their chemical composition. As a result of this testing, ConvaTec discovered (or confirmed) the existence of silver nitrate and chloride. Shortly thereafter, Jacques, who had not worked on the ConvaTec silver technology since February 2000, picked up the internal testing, added ammonium chloride to the silver solution and, "discovered" the solution to ConvaTec's discoloration problem. Eventually, ConvaTec moved from ammonium chloride to sodium chloride, the solution used successfully by AcryMed and previously determined to be problematic by Jacques.

This evidence, viewed in a light most favorable to Plaintiff, raises a genuine issue of material fact with regard to ConvaTec's use of the confidential information

---

4. Plaintiffs also allege that ConvaTec misused confidential information relating to the process used by AcryMed to impregnate the wound dressing with its silver solution. Because the court finds a genuine issue of mate-

rial fact with regard to the chloride solution, which defeats Defendants' motion for summary judgment, the court need not address this allegation as well.

obtained either directly from Gibbins or indirectly from the destructive testing of AQUACEL® prototypes after ConvaTec decided to pursue its internal technology. This evidence must be considered and weighed by the ultimate trier of fact. Defendants' motion for summary judgment on Plaintiffs' breach of contract claim is denied.

### Breach of the Duty of Good Faith and Fair Dealing Claim

The implied, contractual duty of good faith and fair dealing is a well-recognized part of Oregon common law. *Best v. United States Nat'l Bank of Or.*, 303 Or. 557, 561, 739 P.2d 554 (1987). This duty requires that the parties will not act in a way that destroys or injures the other, *Perkins v. Standard Oil Co.*, 235 Or. 7, 16, 383 P.2d 107 (1963), or that frustrates or defeats the object of the contract. *Warnock v. Bonneville General Agency, Inc.*, 271 Or. 634, 533 P.2d 333 (1975). The contractual good faith doctrine is designed to "effectuate the reasonable contractual expectations of the parties." *Best*, 303 Or. at 561, 739 P.2d 554. "The obligation of good faith does not vary the substantive terms of the bargain * * *, nor does it provide a remedy for an unpleasantly motivated act that is expressly permitted by contract* * *." *U.S. National Bank v. Boge*, 311 Or. 550, 567, 814 P.2d 1082 (1995).

The only contract between the parties was the Agreement. Accordingly, the analysis of Plaintiffs' breach of the contractual duty of good faith and fair dealing must be in relation to the parties' reasonable expectations under the terms of the Agreement.

The Agreement provided for the exchange of confidential information to allow ConvaTec to determine if it wanted to enter into some kind of partnership with AcryMed for the development of AcryMed's silver technology. Plaintiffs assert that ConvaTec's preference for developing its own technology and its failure to disclose this preference to AcryMed created a conflict of interest that violated the contractual duty of good faith and dealing. Additionally, Plaintiffs argue that ConvaTec's lack of finances to fund the partnership and resulting inability to enter into any type of joint development agreement also breached the implied contractual duty.

First, there was no requirement that the parties enter into a joint development agreement. The Agreement merely indicated that ConvaTec was interested in learning more about AcryMed's technology so that it could make a reasoned decision about marketing and distributing AcryMed's product. The fact that AcryMed wanted a relationship with ConvaTec does not mean that ConvaTec was obligated in any way to enter into such a relationship. The evidence establishes that AcryMed knew that ConvaTec was working on an internal silver technology and was looking to sources other than AcryMed to assist in impregnating AQUACEL® with silver. It was not reasonable for AcryMed to expect that some sort of joint development agreement would necessarily result from the Agreement.

ConvaTec performed in accordance with the express terms of the Agreement by evaluating AcryMed's silver technology to determine whether it had an interest in either marketing and distributing Acry-Derm or incorporating the silver technology into its existing product. ConvaTec's interest in pursuing its own technology or its inability to fund a partnership does not equate to bad faith. Once ConvaTec decided not to partner with AcryMed, it investigated a relationship with Accordis, the company that manufactured AQUACEL®. ConvaTec merely chose to pursue a different partner, a possibility AcryMed was aware of early on in their relationship with

ConvaTec. Plaintiffs' contractual claims against Defendants are limited to express breach of the Agreement by using confidential information disclosed by AcryMed under the terms of the Agreement in its own silver technology. Defendants' motion for summary judgment on Plaintiffs' claim for breach of the contractual duty of good faith and fair dealing is granted.

**Violation of Oregon's Uniform Trade Secrets Act**

In their Fourth Claim for Relief, Plaintiffs allege that ConvaTec misappropriated AcryMed's trade secrets in violation of O.R.S. 646.461(2) of the Oregon Uniform Trade Secrets Act (the "Act"). To establish a claim under the Act, a plaintiff must demonstrate that: (1) the subject of the claim qualifies as a statutory trade secret; (2) the plaintiff employed reasonable measures to maintain the secrecy of its trade secrets; and (3) the conduct of the defendants constitutes statutory misappropriation." *Western Medical Consultants, Inc. v. Johnson,* 835 F.Supp. 554 (D.Or.1993). O.R.S. 646.641 defines "misappropriation" as the improper acquisition, disclosure or use of a trade secret.

Defendants argue that there is no evidence that ConvaTec improperly acquired, disclosed or used any of AcryMed's trade secrets. The court has found a genuine issue of material fact exists with regard to whether ConvaTec used AcryMed's confidential information to develop its own silver technology. This would constitute an improper use of a trade secret under the Act. Defendants are not entitled to summary judgment on Plaintiffs' claim under the Act.

**Preemption of Plaintiffs' Tort Claims by the Act**

Defendants assert that Plaintiffs' claims for quantum meruit, tortious breach of the implied duty of good faith and fair dealing and fraud are preempted by the Act. The Act provides that it supercedes "conflicting tort, restitution or other laws of Oregon providing civil remedies for misappropriation of a trade secret." O.R.S. 646.473(1). Actions seeking contractual and criminal remedies are not affected by the Act. O.R.S. 646.473(2)(a)and (c). Additionally, a plaintiff may still pursue an action for "civil remedies that are not based upon misappropriation of a trade secret." O.R.S. 646.473(b).

Oregon courts have not interpreted this language or addressed the extent to which the Act preempts civil remedies. However, a number of courts in other states have extended the preemptive effect of the same language to claims that are based on the same operative facts as a claim for trade secret misappropriation under the Act. *Penalty Kick Management Ltd. v. Coca Cola Company,* 318 F.3d 1284, 1297–98 (11th Cir.2003) Where the essence of the claim relates primarily to the alleged misappropriation of a trade secret, the claim is displaced by the preemptive language of the Act. *Hutchison v. KFC Corp.,* 809 F.Supp. 68, 72 (D.Nev.1992).

Plaintiffs' claim for tortious breach of the implied duty of good faith and fair dealing is based on Plaintiffs' allegations that "ConvaTec did not act in good faith when and after it entered into the CDA Agreement, obtained the critical information it needed to create AQUA-CEL®AG and then terminated negotiations to consummate a license and/or joint venture." Plaintiffs' claim is based on Defendants' wrongful appropriation of confidential information from AcryMed and using it for its own benefit. The essence of this claim not only relates to the alleged misappropriation of a trade secret, it relies on such allegations. Plaintiffs' claim for tortious breach of the implied duty of good faith and fair dealing is preempted by the Act. Defendants are entitled to summary judgment on this claim.

██ Similarly, in their claim for relief based on quantum meruit, Plaintiffs allege that Defendants derived a substantial benefit from the "information and knowledge conferred upon it by AcryMed for the development, manufacture and sale of the AQUACEL® AG product." The information and knowledge provided to Defendants is the same information and knowledge characterized by Plaintiffs as trade secrets in their claim for recovery under the Act. Plaintiffs' quantum meruit claim is clearly based on the same set of operative facts as Plaintiffs' claim under the Act and is preempted by the Act.

Plaintiffs argue that their quantum meruit claim "sounds in contract" and is therefore, covered by the exception for contract claims. In support of this argument, Plaintiffs rely on *Jaqua v. Nike, Inc.*, 125 Or.App. 294, 865 P.2d 442 (1993), in which the Oregon Court of Appeals held that a claim by a individual against his former employer for damages based on the employer's use of a new shoe idea without compensation sounds in contract for the purpose of the statute of limitations. This case is distinguishable from that currently before the court in two important particulars. In *Jaqua*, the parties did not have a contract that covered the employee's development of new products. Here, the Agreement specifically covered the confidential information and Plaintiffs are pursuing a claim for breach of that express contract. Second, the issue before the court in *Jaqua* was whether the claim was governed by the tort or contract statute of limitations, not whether the claim was preempted by the Act. Courts that have specifically considered the preemptive effect of the Act on a claim for quantum meruit have found that such a claim is preempted by the Act. *Penalty Kick*, supra, 318 F.3d at 1297–98; *Glasstech, Inc. v. TGL Tempering Systems, Inc.*, 50 F.Supp.2d 722, 730–31 (N.D.Ohio 1999).

In light of the clear direction provided by the cases with regard to the specific issue at hand, the court finds that Plaintiffs' quantum meruit claim sounds in tort and is preempted by the Act. Defendants are entitled to summary judgment on this claim.

██ In the Fifth Claim for Relief, Plaintiffs allege that ConvaTec misrepresented its intentions in entering into the Agreement. Plaintiffs contend that AcryMed was led to believe that ConvaTec was interested in entering into a joint venture or other business relationship with AcryMed when, in fact, all ConvaTec wanted to do was make use of the information provided by AcryMed under the Agreement to develop its own silver technology. Once again, the wrongful appropriation and subsequent use of AcryMed's confidential information by ConvaTec is at the core of the claim. There would be no claim for fraud, and Plaintiffs would have suffered no damages, in the absence of Defendants' misappropriation of AcryMed's trade secrets. Plaintiffs would merely have a claim for fraud based on an agreement to discuss the possibility of entering into a relationship in the future. Plaintiffs would be unable to prove any reliance on Defendants' misrepresentations or any damage resulting therefrom. The misappropriation of trade secrets is the essence of the fraud claim. Defendants used their misrepresentation to wrongfully obtain access to Plaintiffs' trade secrets. Plaintiffs' fraud claim is also preempted by the Act and Defendants are entitled to summary judgment on this claim.

## PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT AGAINST DEFENDANTS' COUNTERCLAIMS

### Breach of Contract

██ Defendants assert that AcryMed breached the Agreement by using confi-

dential information disclosed to it with regard to the process of impregnating AQUACEL® with AcryMed's silver technology. Specifically, Defendants allege that AcryMed improperly used the following confidential information:

(1) the identity of a proprietary dressing to which silver might be applied,

(2) the concept and plan of impregnating ConvaTec's AQUACEL® dressing with silver and

(3) the medium in which the chemical make up of the silver compound should be set.

Defendants also contend that AcryMed engaged in unauthorized testing and research of AQUACEL® dressings.

Based on the record before the court, the first information provided to AcryMed by ConvaTec with regard to AQUACEL® was on March 31, 2000, when Bowler forwarded AQUACEL® samples to AcryMed with a brief description of ConvaTec's method of applying silver to the samples. However, prior to that date, Hopman had successfully impregnated AQUACEL® with AcryMed's silver technology using virtually the same method that was disclosed in the Second Application in June 2000. Accordingly, it is clear that AcryMed discovered the identity of a proprietary dressing to which silver might be applied, the concept and a plan for impregnating ConvaTec's AQUACEL®dressing with silver and the medium in which the chemical make up of the silver compound should be set prior to receiving any relevant information or AQUACEL® samples from ConvaTec.

Even assuming AcryMed continued refining its method after receiving information and samples from ConvaTec on March 31, 2000, there is no evidence that AcryMed used the information in its technology. Bowler described a method which consisted of preparing the chemistry in a neat industrial methylated spirit, soaking the dressing for one hour, blotting dry on absorbent paper and air drying in a suitable cabinet. However, the method AcryMed was already using consisted of combining silver nitrate and sodium chloride and using organic solvents, including alcohol, to place the silver chloride in the dressing. AcryMed stayed true to its original method throughout its relationship with ConvaTec and did not use any of the confidential information provided by ConvaTec in the development of its silver-impregnated AQUACEL® samples.

Defendants argue that because AcryMed did not experiment with AQUACEL® until after the Agreement was signed, ConvaTec is somehow responsible for AcryMed's decision to attempt to impregnate AQUACEL® with its silver technology. There is no evidence that anyone from ConvaTec asked, or even suggested, that AcryMed attempt to incorporate its silver technology into an AQUACEL® sample. The evidence does show that Hopman purchased a number of wound dressings, including AQUACEL®, and attempted to impregnate each dressing with the silver technology on March 24, 2000. At the March 29, 2000, meeting, Bowler informed AcryMed that ConvaTec was interested in developing technology to impregnate AQUACEL® with silver and asked Gibbins if he thought it was possible. AcryMed had already successfully impregnated AQUACEL® with it silver technology at that time and provided a sample to Bowler. Based on the evidence in the record, this was the first time ConvaTec mentioned AQUACEL® and the silver technology in the same conversation.

Defendants also argue that the results of ConvaTec's testing of the silver-impregnated AQUACEL® samples were confidential and that AcryMed improperly disclosed such test results in the Second Application. AcryMed and ConvaTec

agreed that AcryMed would concentrate on the production of the silver-impregnated AQUACEL® dressings while Conva-Tec would test the effectiveness of the prototypes. ConvaTec merely tested the samples provided by AcryMed to determine the extent of the sustained release nature of the product. The testing did not result in any unique or protected information. A number of companies, including AcryMed, had the ability and facilities necessary to complete such testing. In fact, AcryMed had already tested the silver technology in its own product and knew the extend of the sustained release nature of that product. The results of the testing was readily ascertainable by proper means, was already in AcryMed's possession based on its previous testing of its silver technology and does not qualify as confidential information under the terms of the Agreement. In the Second Application, AcryMed explained in detail the testing it used to confirm the time-released nature of the prototype. There is no evidence in the record that ConvaTec provided AcryMed with its testing methods or that ConvaTec ever performed the test described in the Second Application.

Defendants have failed to present evidence that AcryMed used any confidential information in violation of the Agreement. ConvaTec's claims for breach of that Agreement, as well as the implied covenant of good faith and fair dealing, fail and Plaintiffs are entitled to summary judgment on Defendant's Third Cause of Action.

### Violation of Oregon's Uniform Trade Secrets Act

Defendants' Fifth Cause of Action for violation of the Act is based on the same allegations as their breach of contract claims. The record is void of any evidence that AcryMed used ConvaTec's trade secrets in the development of its method for impregnating AQUACEL® with its silver technology. According, the record is void of evidence supporting Defendants' claim for violation of the Act and dismissal of the claim is appropriate.

### Preemption of Defendants' Tort Claims by the Act

Defendants' alleged claims for quantum meruit, breach of a duty of confidentiality and fraud rely wholly on Defendants' allegations that AcryMed misappropriated ConvaTec's trade secrets. In view of the discussion of the preemptive effect of the Act on tort claims based on the same core facts set forth above, the court finds that Defendants' claims for quantum meruit, breach of a duty of confidentiality and fraud are preempted by the Act.

### *Conclusion*

Defendants' motion (# 102) for summary judgment is GRANTED with regard to Bristol–Myers and Plaintiffs' claims for breach of the implied contractual duty of good faith and fair dealing, the tortious breach of the implied duty of good faith and fair dealing, quantum meruit and fraud and DENIED with regard to Plaintiffs' claims for breach of contract and violation of Oregon's Uniform Trade Secrets Act. Defendants' motion for summary judgment on Plaintiffs claim for patent infringement will be addressed in a separate opinion.

Plaintiffs' motion (96) for partial summary judgment is GRANTED in its entirety.